

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES SECURITIES and EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **No. 07 C 4684** |
| **v.** | ) ) | **Magistrate Judge Sheila Finnegan** |
| **SENTINEL MANAGEMENT GROUP, INC., ERIC A. BLOOM, and CHARLES K. MOSLEY,** | ) ) ) ) ) | |
| **Defendants.** | | |

## MEMORANDUM OPINION AND ORDER

This is a securities fraud case brought by the Securities and Exchange Commission ("SEC") against Sentinel Management Group, Inc. ("Sentinel"), Eric Bloom ("Bloom"), and Charles Mosley ("Mosley"). Currently before the Court is Bloom's Motion to Compel the Production of Documents and Interrogatory Responses from the SEC. (Doc. 165.) In the motion, Bloom seeks portions of the SEC examination file for the 2002 examination of Sentinel that the SEC withheld based upon the deliberative process privilege. He also seeks to compel the SEC to answer an interrogatory calling for the identity of each person interviewed by the SEC, as well as the dates of interview, the participants, and a detailed summary of what each witness said. The SEC contends that it need not respond because this information constitutes attorney work product, some of it is irrelevant (dates of interviews and participants), and Bloom's motion is untimely. For reasons set forth below, the Court grants the motion in part and denies it in part.

## BACKGROUND[1]

Sentinel was a registered investment adviser that primarily managed short-term cash investment portfolios for clients such as hedge funds, financial institutions, pension funds, Futures Commission Merchants, and individuals. This SEC enforcement action alleges that Sentinel engaged in a massive fraud involving misappropriation and misuse of client assets. (Doc. 64 ¶¶ 1-2.) The fraud, which began no later than 2003, was allegedly devised and carried out by Bloom (then Sentinel's President and Chief Executive Officer), and co-defendant Mosley (Sentinel's Senior Vice President and Head Trader from October 2002 until August 2007). (*Id.* at ¶¶ 1, 3, 17-18.)

Defendants Sentinel, Bloom and Mosley allegedly exposed clients to substantial undisclosed risk by relying extensively on leveraging activities, using Client Portfolio assets contrary to stated investment objectives in order to finance risky trading for the benefit of Sentinel's house portfolio (owned by Sentinel insiders, including Bloom and Mosley). (*Id.* at ¶ 3.) In addition, Bloom and Mosley allegedly used Client Portfolio assets to collateralize a bank line of credit to Sentinel, thus subjecting clients to the additional risk that the lender would assert a security interest in the assets and sell them if Sentinel could not meet its loan obligations. (*Id.*)

When credit markets tightened dramatically in the summer of 2007, Sentinel faced a reduction in the value and liquidity of the debt securities held in the Client Portfolios and a surge in client redemption requests. (*Id.* at ¶ 6.) Because such a large amount of the Client Portfolio assets was tied up in Sentinel's leveraging strategy or being used to

---

[1]     The background facts are taken from the First Amended Complaint (Doc. 64).

collateralize the Line of Credit, Sentinel ran out of cash to meet client redemptions and filed
for Chapter 11 bankruptcy. (Id.) The SEC expects to prove that the alleged misconduct
resulted in Sentinel losing several hundred million dollars of the approximately $1.4 billion
in Client Portfolio assets that Sentinel had under management at the time of its collapse.
(Id. at ¶ 7.) The SEC alleges that Defendants' conduct violated numerous securities laws
and it seeks a permanent injunction from further violations, as well as an order requiring
Bloom and Mosley to disgorge profits and pay civil monetary penalties.

## DISCUSSION

### I.    Document Request Seeking 2002 SEC Examination Papers

In February 2009, Bloom served the SEC with document requests seeking, among
other things, documents relating to the SEC's examinations of Sentinel. One of these
examinations was conducted in January and February 2002 and culminated in the
issuance of a deficiency letter. In response to Bloom's document request, the SEC
produced communications between the SEC and Sentinel relating to the 2002
examination, including the deficiency letter and other documents that had been exchanged
by Sentinel and the SEC. Numerous documents were withheld, however, based upon the
SEC's assertion that these documents are protected by the government deliberative
process privilege.[2]  The SEC describes the withheld materials as: "internal SEC staff
communications, SEC examination staff work product, working copies of documents
received from Sentinel with examiner notes, internal memoranda, the examination report,
and analysis and drafts of such materials." (Doc. 175, at 2-3.) The SEC later decided to

---

[2]        The SEC also initially claimed an examination privilege, which it later
withdrew.

redact, to the extent practicable, any examiner notes appearing on the SEC's working copies of documents received from Sentinel and produced those documents.

In his motion to compel, Bloom challenges the SEC's assertion of the deliberative process privilege, arguing that the SEC has not satisfied the procedural requirements for asserting the privilege, and the privilege does not apply to the documents in any event. Bloom further argues that, even if the documents fall within the scope of the privilege, he has a particularized need for the documents and his need outweighs the SEC's interest in their confidentiality. The SEC disagrees. It also asserts that the documents are irrelevant.

## A.    Relevancy

As a preliminary matter, the Court is unable to conclude that the documents at issue do not "encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *see also Camphausen v. Schweitzer,* No. 10 C 3605, 2010 WL 4539452, at *3 (N.D. Ill. Nov. 3, 2010). The SEC argues that the 2002 examination papers are not relevant because the complaint alleges that the fraudulent conduct did not begin until sometime after October 2002 when Bloom hired co-defendant Mosley to work at Sentinel. (Doc. 175, at 8.) However, the examination took place in January and February 2002, only months before the SEC alleges the misconduct began.

Bloom argues that facts regarding what the SEC reviewed in early 2002 and what action it took or did not take are relevant to his state of mind and good faith defense. While the SEC argues that its non-public "perspectives" during the examination, if not

4

communicated to Sentinel, are not relevant, the SEC's silence on a practice arguably could be relevant to the SEC's allegation that Bloom knowingly committed fraud. At oral argument on October 18, 2010, Bloom also argued that certain issues identified by the SEC as being subjects of the 2002 examination are directly related to the allegations in the complaint, including Sentinel's disclosure to clients regarding ownership of securities held in trust accounts, Sentinel's compliance with Rule 206(4)-2 of the Investment Advisers Act of 1940, and Sentinel's daily reconciliation process. Given the closeness in time between the 2002 examination and the alleged wrongful conduct, the Court is unwilling to deny Bloom's motion based on the SEC's view that nothing in the withheld documents is relevant.

## B.     Deliberative Process Privilege

The SEC insists that the documents are nonetheless protected from disclosure by the deliberative process privilege. "The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency." *United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993). "The privilege has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980). Thus, the privilege covers "recommendations, draft documents,

5

proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.*

For the privilege to apply, the communications must be both "pre-decisional" and "deliberative." *Evans v. City of Chicago,* 231 F.R.D. 302, 316 (N.D. Ill. 2005) (citing *Becker v. IRS,* 34 F.3d 398, 403 (7th Cir. 1994)). That is, the documents must be a direct part of the deliberative process in that they make recommendations or express opinions on legal or policy matters. *Vaughn v. Rosen,* 523 F.2d 1136, 1144 (D.C. Cir. 1975). "[P]re-decisional materials are not exempt merely because they are pre-decisional; they must also be part of the agency give-and-take of the deliberative process by which the decision itself is made." *Id.* In addition, "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal,* 617 F.2d at 866.

Discussion of objective facts, as opposed to opinions and recommendations, generally is not protected by the deliberative process privilege. *Trentadue v. Integrity Comm.,* 501 F.3d 1215, 1227-28 (10th Cir. 2007); *K.L. v. Edgar,* 964 F.Supp. 1206, 1208 (N.D. Ill. 1997). For this reason, purely factual information must be segregated from deliberative material and produced unless it is inextricably intertwined with the privileged material or would itself reveal the deliberative process. *Trentadue,* 501 F.3d at 1227-28; *Feshbach v. SEC,* 5 F. Supp. 2d 774, 784-85 (N.D. Cal. 1997). "To be considered 'deliberative,' a document should reflect policy or decision-making processes, rather than

6

purely factual or investigative matters." *SEC v. Nacchio,* No. 05-cv-0480, 2009 WL
211511, at *3 (D. Colo. Jan. 29, 2009) (citing *Trentadue,* 501 F.3d at 1277).

The deliberative process privilege is not absolute. It may be overcome where the
party seeking the documents establishes that he has a particularized need for the
documents and his need outweighs the government's interest in confidentiality. *Farley,* 11
F.3d at 1389.

## 1. Has the SEC satisfied the procedural requirements?

To make a threshold showing that the deliberative process privilege applies, the
government must satisfy three procedural requirements: (1) the department head with
control over the matter must make a formal claim of privilege, after personal consideration
of the matter; (2) the responsible official must demonstrate, typically by affidavit, precise
and certain reasons for preserving confidentiality of the documents in question; and (3) the
official must specifically identify and describe the documents. *Evans,* 231 F.R.D. at 316
(citing *Ferrell v. U.S. Dep't of Hous. and Urban Dev.,* 177 F.R.D. 425, 428 (N.D. Ill. 1998)).

In response to Bloom's motion, the SEC submitted a declaration from the Secretary
of the SEC, Elizabeth Murphy, which substantially complies with these requirements. In
the declaration, Murphy states that the SEC's Associate General Counsel for Litigation and
Administrative Practice asserted the deliberative process privilege with respect to the
documents after giving personal consideration to the matter. (Doc. 175-3 at ¶ 3.) Murphy
further states that the Associate General Counsel determined that the "disclosure of this
information would have an inhibiting effect upon the fullness and frankness of verbal and
written expression among the SEC and its staff members and, thus would have a

7

detrimental effect on the SEC's decision-making processes." *Id.* Finally, Murphy describes the documents at issue as "documents received from Sentinel with examiner notes, internal memoranda, the examination report, and analysis and drafts of such materials, including draft external communications." *Id.*

Bloom argues that the declaration is insufficient because it fails to meet the requirements set forth in *Kelly v. City of San Jose,* 114 F.R.D. 653 (N.D. Cal. 1987), including the requirement that the government address why its interest cannot be protected with a carefully crafted protective order. (Doc. 179, at 2-3.) However, the *Kelly* court did not apply the deliberative process privilege. Rather, it considered a variety of privileges and the purposes behind those privileges and ultimately applied a privilege (which it called the "official information" privilege) and balancing test tailored specifically to the local police department records at issue in that case. *Kelly,* 114 F.R.D. at 660. Bloom has not cited any cases in this jurisdiction or others adopting the requirements in *Kelly* with respect to the deliberate process privilege, nor has the Court found any.[3] The Murphy declaration substantially complies with the procedural requirements in this district, as set forth in *Evans,* and is therefore sufficient to assert the privilege.[4]

---

[3]     Bloom did not mention the requirements set forth in *Kelly* until his reply brief, which was filed after the SEC provided the Murphy declaration.

[4]     In the declaration, Murphy also states that the Associate General Counsel determined that producing the documents "*could* reveal predecisional staff deliberations." (Doc. 175-3 at ¶ 3 (emphasis added)). Murphy's use of the word "could" instead of "would" gives the Court some pause. However, the Court has reviewed the documents *in camera,* and, as discussed below, it has directed the SEC to produce any documents that in fact do not reveal pre-decisional deliberations.

## 2. Does the deliberative process privilege apply?

Bloom argues that the SEC's 2002 examination documents are not subject to the deliberative process privilege because they are not related to the process of formulating policy. (Doc. 166, at 7.) In his view, the privilege is strictly limited to documents relating to the formulation of policy and does not cover other agency decisions. (Doc. 179, at 4.) This Court disagrees that the privilege is so narrow. *See Nacchio,* 2009 WL 211511, at \*6 (expressly rejecting such limitation of the privilege). Instead, the privilege "protects communications that are part of the decision-making process of a governmental agency." *Farley,* 11 F.3d at 1389. For example, courts have applied the privilege to communications involved in agency decisions of whether to take enforcement action or sue. *See id.* (privileged documents were part of the agency's deliberative process leading to a decision to sue); *EEOC v. Continental Airlines, Inc.,* 395 F. Supp. 2d 738, 741 (N.D. Ill. 2005) (report created to assist EEOC in deciding whether to pursue enforcement action protected by deliberative process privilege); *Utah Med. Prods. v. McClellan,* No. 2:03-CV-0525, 2004 WL 988877, at \*2 (D. Utah Mar. 31, 2004) (documents relating to FDA's inspection of facility and decision of whether to initiate enforcement action protected by the deliberative process privilege); *Burke Energy Corp. v. Dep't of Energy,* 583 F.Supp. 507, 513 (D. Kan. 1984) (documents relating to department's audit of oil company and draft settlement papers protected by the deliberative process privilege). In this case, documents relating to the SEC's decision of whether to take action with respect to the 2002 examination of Sentinel may well be subject to the deliberative process privilege if the documents are pre-decisional, deliberative, and otherwise meet the definition of the privilege.

9

The Court has conducted an *in camera* review of the 2002 examination documents withheld by the SEC. Based on that review, the Court concludes that not all of the documents are protected by the deliberative process privilege. Some of the documents contain purely factual information that can be segregated from deliberative information. Other documents appear to include opinions or recommendations that the SEC ultimately adopted and included in its delinquency letter to Sentinel. As discussed above, this type of information is not protected by the deliberative process privilege since the privilege is limited to recommendations, proposals, suggestions, draft documents, and other materials that reflect the personal opinions of the writer rather than the policy of the agency. The privilege does not extend to purely factual information that can be disclosed without revealing the deliberative process. Nor does it protect opinions and recommendations that were adopted as the agency's final position.

With these principles in mind, the Court directs the SEC to re-evaluate the documents that have been withheld. The SEC is directed to produce those documents or portions of documents that contain purely factual information or contain opinions or recommendations that were ultimately adopted by the SEC as its final position with respect to the 2002 examination of Sentinel. As to any documents that the SEC continues to withhold under claim of privilege, the SEC must provide Bloom with a log that separately identifies each document rather than providing a general group description for all the withheld documents as the current log does. In addition, the log should provide the basis for asserting the deliberative process privilege as to each document (*e.g.,* document reveals opinions, recommendations, etc., as opposed to purely factual information), and comply with the other basic requirements for a privilege log (*e.g.,* date of the document,

author and recipients). *See Allendale Mut. Ins. v. Bull Data Systems, Inc.,* 145 F.R.D. 84, 88 (N.D. Ill. 1992). To the extent that Bloom believes there is a basis to compel any of the documents that the SEC continues to withhold, he should meet and confer with the SEC and, if unable to reach agreement, file a motion to compel.[5] The Court will then address whether the SEC has a basis for invoking the deliberative process privilege and, if so, whether Bloom has shown a particularized need for the information that outweighs the SEC's interest in confidentiality.

## II. Interrogatory Seeking Detailed Summaries of SEC Witness Interviews and Other Information

Defendant Bloom served his "First Interrogatory to Plaintiff" on January 15, 2010, a month before the final discovery cutoff. (Doc. 166-5.) The pending motion seeks to compel answers to only three of the six subparts of the interrogatory: (a) the date(s) on which the SEC participated in any meetings and/or interviews of any witness or potential witness in relation to this case and its investigation; (b) the names, employer, and titles of all persons present at each meeting and/or interview; and (f) a detailed summary of what the witness or potential witness said at each such meeting or interview. (Doc. 166, at 4.)

The SEC contends that the motion should be denied because (1) Bloom waited too long before filing it, (2) the information is protected attorney work product,[6] and (3) the

---

[5]     Any such motion need only identify the documents at issue and provide the pertinent pages of the log. No further legal argument is necessary.

[6]     The SEC's privilege log also asserted the law enforcement privilege and the common interest doctrine with respect to information concerning the identity of non-SEC personnel present at witness interviews. In its brief, however, the SEC relies solely on the work product doctrine. (Doc. 175, at 14, n.8.)

11

dates of interviews and identities of those attending (and their employers and titles) are irrelevant to any claim or defense. The Court discusses each argument in turn.

### A. Timeliness of the Motion

As an initial matter, this Court declines to deny the motion to compel based on the argument that Bloom waited too long before serving the interrogatory and filing the motion to compel. The interrogatory admittedly was served quite late in the discovery process, but it was still one month before the extended fact discovery cutoff. As for the motion to compel, Bloom undoubtedly could have filed it more quickly after learning of the SEC's objections and exhausting the meet-and-confer process. At the same time, this is a complex case involving a significant volume of documents and witnesses. The lawyers for the SEC and Bloom appear to have worked diligently to complete the extensive fact and expert discovery in the allotted time. In addition, there was no court-imposed deadline for filing motions to compel. Under all the circumstances, the Court cannot conclude that Bloom's counsel were dilatory or that the delay in filing the motion to compel was unreasonable. *See, e.g., LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2009 WL 3294802, at *2 (N.D. Ill. June 22, 2009) (decision to deny a motion to compel as untimely is within the court's broad discretion inherent in its power to control discovery).

### B. Summaries of SEC Witness Interviews

#### 1. Does the information constitute attorney work product?

Federal Rule of Civil Procedure 26(b)(3) defines the scope of the work product protection in this case. Under Rule 26(b)(3), a party ordinarily may not discover "documents and tangible things that are prepared in anticipation of litigation or for trial" by

12

opposing counsel. Such materials may be discoverable, however, if the seeking party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Rule 26(b)(3)(A). Even if a court orders work product to be disclosed under such circumstances, it must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Rule 26(b)(3)(B). The "dual purposes" of the work product doctrine are: "(1) to protect an attorney's thought processes and mental impressions against disclosure; and (2) to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts." *Sandra T.E. et. al. v. South Berwyn School District 100*, 600 F.3d 612, 622 (7th Cir. 2010).

Materials prepared by SEC attorneys in anticipation of litigation that disclose what they learned during witness interviews undoubtedly constitute attorney work product. *See, e.g., Hickman v. Taylor,* 329 U.S. 495, 510-11 (1947) ("This work is reflected, of course, in interviews, statements, memoranda, . . . and countless other tangible and intangible ways-aptly though roughly termed . . . as the 'Work product of the lawyer.'"); *Sandra T.E.,* 600 F.3d at 622 ("[law firm's] witness-interview notes and memoranda were plainly prepared 'with an eye toward' this pending litigation and therefore qualify for work-product protection"); *Harper* & *Row Publishers, Inc. v. Decker,* 423 F.2d 487, 492 (7th Cir. 1970) (per curiam), *aff'd per curiam,* 400 U.S. 348 (1971) ("Where an attorney personally prepares a memorandum of an interview of a witness with an eye toward litigation[,] such

memorandum qualifies as work product even though the lawyer functioned primarily as an investigator.").

Perhaps recognizing this, Bloom chose *not* to serve a document request for the SEC's pre-existing interview summaries. Instead he served an interrogatory asking the SEC to provide a "detailed summary" of what each witness said. Bloom argues that this interrogatory does not seek work product because it does not "seek to discover any *document or tangible things* prepared in anticipation of litigation or for trial" within the meaning of Rule 26(b)(3) but only "facts, knowledge and prior statements of witnesses" that were "communicated to the plaintiff in interviews." (Doc. 166, at 14.)

This is a distinction without a difference. Either way, Bloom is asking opposing counsel to produce a document prepared by counsel that divulges what counsel learned from interviewing potential witnesses in anticipation of litigation. This is classic attorney work product whether Bloom seeks the information by means of a document request for existing interview summaries, or an interrogatory requiring the SEC to prepare a written response summarizing those interviews. *See Hickman*, 329 U.S. at 499-500, 512-13 (declining to require response to interrogatory that asked the defendant to "set forth in detail the exact provisions of any ... oral statements or reports").

### 2. What standard applies for disclosure of the work product?

Because the information that Bloom seeks constitutes attorney work product, the Court may order disclosure only if the requisite showing is made. For fact work product, the requisite showing is a "substantial need" for the information and an inability to get it elsewhere without "undue hardship." Rule 26(b)(3)(A)(ii). But if disclosure of the

14

information would reveal opposing counsel's "mental impressions, conclusions, opinions, or legal theories" (hereinafter "opinion work product"), then Rule 26(b)(3)(B) affords "special protection" and a "far stronger" showing must be made. *Upjohn v. United States*, 449 U.S. 383, 400, 402 (1981) ("Rule 26 accords special protection to work product revealing the attorney's mental processes. ... While we are not prepared at this juncture to say that such material is always protected by the work-product rule, we think a far stronger showing of necessity and unavailability by other means ... would be necessary to compel disclosure."); *Jackson v. City of Chicago,* No. 03 C 82829, 2006 WL 2224052, at *4 (N.D. Ill. July 31, 2006) (citing *Upjohn*, 449 U.S. at 401-02) ("Neither the Supreme Court nor the Seventh Circuit has identified the precise standard for overcoming opinion work product; however, precedent instructs that opinion work product 'cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship ... a far stronger showing of necessity and unavailability by other means ... would be necessary to compel disclosure.'").

The SEC contends that the "heightened" standard applies here because the information that Bloom seeks is based on oral statements of witnesses to the SEC attorneys and necessarily would reveal the attorneys' mental impressions and opinions (Doc. 175, at 12.) There is considerable authority for the proposition that the heightened standard applies to this type of attorney work product. As the Supreme Court noted in *Upjohn*, "[a]lthough th[e] language [in Rule 26(b)(3)(B)] does not specifically refer to memoranda based on oral statements of witnesses, the *Hickman* court stressed the danger that compelled disclosure of such memoranda would reveal the attorney's mental

15

processes. It is clear that this is the sort of material the draftsmen of the Rule had in mind as deserving special protection." 449 U.S. at 400.[7]

Multiple concerns have motivated courts to provide heightened protection to attorney work product stemming from oral witness statements. One concern is that such work product may be inaccurate or untrustworthy. *Hickman*, 329 U.S. at 513 ("[F]orcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness."). *See also In Re Grand Jury Proceedings*, 43 F.3d 966, 970 (5th Cir. 1994) (discovery of oral communications made by third parties to attorney allowed "only in a 'rare situation' because of the danger that the attorney's version of such conversations is inaccurate and untrustworthy ... [and] will reveal the attorney's mental processes or litigation strategy."). Another concern is that production of such work product might transform opposing counsel from an advocate to a potential witness in the event that the attorney's summary were used to impeach the witness. *Hickman,* 329 U.S. at 513 ("Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The

---

[7]     The Notes of Advisory Committee on 1970 Amendment to Rules, state with respect to Rule 26(b)(3)(B): "The subdivision then goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories . . . of an attorney or other representative of a party. The *Hickman* opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews. The courts have steadfastly safeguarded against disclosure of lawyers' mental impressions and legal theories .... In enforcing this provision of the subdivision, the courts will sometimes find it necessary to order disclosure of a document but with portions deleted."

16

standards of the profession would thereby suffer."); *see also In re Grand Jury Investigation,*
599 F.2d at 1231.

Finally and most significantly, even where the attorney's summary of a witness's oral
statements appears to be entirely factual, the attorney's mental processes are necessarily
disclosed to some degree. *Upjohn,* 449 U.S. at 399 (citing *Hickman,* 329 U.S. at 513)
("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is
particularly disfavored because it tends to reveal the attorney's mental processes.");
*Hickman,* 329 U.S. at 516-17 (Jackson, J., concurring) (observing that "the statement
would be his [the attorney's] language, permeated with his inferences"); *Baker v. GMC,* 209
F.3d 1051, 1054 (8th Cir. 2000) ("attorney notes reveal an attorney's legal conclusions,
because when taking notes, an attorney often focuses on the facts he deems legally
significant"; *SEC v. Strauss,* No. 09 Civ. 4150, 2009 WL 3459204, at *5 (S.D.N.Y. Oct. 28,
2009) ("[S]ummaries are not *verbatim* copies and necessarily involve some level of
judgment in deciding what to note and what not to note."). *Contra Dir., Office of Thrift
Supervision v. Vinson & Elkins, LLP,* 124 F.3d 1304, 1307-08 (D.C. Cir. 1997) ("Appellees
argue, and the district court agreed, that a lawyer's interview notes are *always* opinion work
product, undiscoverable without 'extraordinary justification.' But this proposition goes too
far. We recently observed that under certain circumstances purely factual material
embedded in attorney notes may not deserve the super-protection afforded to a lawyer's
mental impressions.").

This Court agrees that an attorney's mental processes are revealed to a certain
extent even when the attorney's memorandum is factual in nature, merely summarizing

17

·what the witness said in response to the attorney's questions. The attorney exercises judgment in determining which witnesses to interview, what subject areas to cover (and not cover), how to frame specific questions and in what order, and how much time to devote to particular topics. Further, the attorney exercises selective judgment in determining what is worthy of being written down (or remembered) during the interview. As a result, when opposing counsel is given access to the attorney's notes or memoranda from a witness interview, the attorney's mental processes necessarily are revealed. For this reason, a heightened standard should apply. That being said, "the less the lawyer's 'mental processes' are involved, the less will be the burden to show good cause." *Harper,* 423 F.2d at 492. The burden would certainly be greater if the attorney's notes included impressions about the credibility of the witness or the accuracy of particular statements made by the witness, or set forth ideas for how best to examine the witness at trial.

### 3.    Has Bloom satisfied the heightened standard?

The SEC argues that Bloom is unable to meet the "heightened standard" necessary to obtain the work product at issue. The SEC reasons that it identified all of the witnesses known to have discoverable information in a Rule 26(a)(1) disclosure and Bloom had "ample opportunity" to depose them or request to speak with them outside of formal discovery. Thus, the SEC argues that it "should not be required to perform that work for him." (Doc. 175, at 13.) Bloom, on the other hand, asserts that he is unable to interview or depose these witnesses because a parallel grand jury proceeding has made witnesses unwilling to provide interviews (except to the SEC) and has caused witnesses to invoke the Fifth Amendment at their depositions rather than answer questions.

18

To better assess the validity of these arguments, the Court requested the parties to provide *in camera* submissions identifying the witnesses on the SEC's Rule 26(a)(1) disclosure who they had interviewed (or attempted to interview), as well as witnesses who had invoked the Fifth Amendment at their depositions. Based on its review of these submissions, the Court determined that there are only four witnesses on the SEC's Rule 26(a)(1) disclosure who gave an interview to the SEC (but declined Bloom's request for one) and who declined to answer questions at a deposition (or said they would decline) based upon the Fifth Amendment. One is co-defendant Mosley. The other three are third party witnesses.[8]

As to these four witnesses, the Court concludes that Bloom has demonstrated that he is unable to obtain information from them directly, either through a deposition or interview. These witnesses gave lengthy interviews to the SEC despite invoking the Fifth Amendment right against self-incrimination as a basis for refusing to answer questions at a deposition. Since the SEC is a regulatory commission of the United States government with the ability to bring enforcement actions and other powers, it is possible that the witnesses felt there was reason to submit to a voluntary interview to show cooperation despite potential criminal exposure.[9] Whatever their motivation, the point is that the SEC

---

[8]     The parties are now aware of the identities of these witnesses, and it is therefore unnecessary to identify them by name in this opinion.

[9]     One of the witnesses signed a "proffer letter" before the interview. According to the SEC's Enforcement Manual:

> Proffers by attorneys and cooperating individuals are an important vehicle used by the staff to assess the probable value of cooperation by individuals and companies and for those individuals and companies to initiate discussions regarding the benefits that may be available if they cooperate.

has been able to interview these witnesses at length to find out what they may testify to at trial, yet Bloom has been denied access to them through either an interview or deposition. This makes the situation a far cry from what was presented in *Hickman* where a party served an interrogatory seeking "oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired." *Hickman,* 329 U.S. at 508. The *Hickman* Court recognized, however, that "production might be justified where the witnesses are no longer available or can be reached only with difficulty." *Id.* at 512. Since *Hickman* was decided at least two courts have ordered the disclosure of attorney work product stemming from oral witness statements where the witness was unable to be deposed by the seeking party. *See SEC v. Thrasher,* No. 92 Civ. 6987, 1995 WL 46681 (S.D.N.Y. Feb. 7, 1995) (ordering production where one witness was dead, the whereabouts of another were unknown, and other witnesses invoked the Fifth Amendment or their lawyers said they would); *United States v. Davis,* 131 F.R.D. 391, 395-96 (S.D.N.Y. 1990) (ordering production where witness, who was out of the country, was hostile to the

---

Proffer agreements are regularly used by the staff to facilitate proffer sessions.

A proffer agreement is a written agreement providing that any statements made by a person, on a specific date, may not be used against that individual in subsequent proceedings, except that the Commission may use statements made during the proffer session as a source of leads to discover additional evidence and for impeachment or rebuttal purposes if the person testifies or argues inconsistently in a subsequent proceeding. The Commission also may share the information provided by the proffering individual with appropriate authorities in a prosecution for perjury, making a false statement or obstruction of justice.

*See* Section 3.3.7 Proffer Agreements found at http://www.sec.gov/divisions/enforce/enforcement manual.pdf (last visited Nov. 22, 2010).

party seeking discovery and invoked Fifth Amendment). In another case, where a witness was unavailable because he had died, the court granted the government discovery of attorney interview memoranda prepared by opposing counsel. *In re Grand Jury Investigation*, 599 F.2d 1224, 1231-32 (3d Cir. 1979).

Balanced against Bloom's need for the information from these witnesses are the dangers from disclosure of this type of work product that were highlighted in *Hickman* and other cases: (1) the attorneys' summaries of witness statements may be inaccurate or unreliable; (2) disclosure may transform the interviewing attorneys from advocates to witnesses (if the summaries are used for impeachment), and (3) the work product may reveal the mental impressions and strategy of the interviewing attorneys. *See supra* pp. 16-17. These dangers, however, are significantly reduced here because of the manner in which the interviews were conducted and documented. Multiple SEC lawyers attended these interviews and took contemporaneous notes. For example, in attendance at the interview of Sentinel's former Chief Financial Office, were six SEC attorneys, the witness's own attorney, and three attorneys representing the bankruptcy trustee for Sentinel. In addition, no fewer than five SEC lawyers made notes of what the witness said during the interview: four made handwritten notes and a fifth used a computer to take particularly detailed notes that, in certain respects read almost like verbatim statements, though no words of the witnesses appear in quotation marks. This latter SEC attorney subsequently prepared a typewritten and more polished final interview summary (eighteen single-spaced pages) presumably based upon the collective notes and recollections of the various SEC attorneys who attended the interview. While there is certainly some danger that the SEC's typewritten interview summary (or a newly created summary prepared in response to

21

Bloom's interrogatory) would not be wholly accurate in capturing what the witness said, this risk is reduced because of the sheer number of SEC lawyers who heard the witness, made contemporaneous notes, and had an opportunity to review the final interview summary for accuracy. A far greater risk would be presented if a single attorney interviewed a witness, took few notes, and later was forced to provide a recollection of what the witness said, "giv[ing] rise to grave dangers of inaccuracy and untrustworthiness." *Hickman,* 329 U.S. at 513.

There is also a reduced risk here that disclosure will transform trial counsel for the SEC from advocate to witness if the attorney summary is used for impeachment at trial. Given the large number of persons attending these four SEC witness interviews, including non-SEC lawyers, there would be no need to mention any particular SEC trial lawyer by name at trial (assuming one was present for an interview), or call an SEC trial lawyer as a witness.

As for the danger that some of the SEC's "mental impressions, conclusions, opinions, or legal theories" may be revealed if the SEC discloses information gathered during the four witness interviews, the Court finds this danger to be relatively low here. Based on an *in camera* review of the SEC's typewritten summaries of the four witness interviews, the Court has determined that the summaries do not contain any explicit mental impressions or opinions or discussion of legal strategy. For example, the SEC attorneys did not indicate their opinions as to the credibility of the witnesses or the truthfulness of particular statements that they made. Nor do the summaries include an assessment of the impact of the witness on the overall case or otherwise discuss legal strategy. Instead, each summary appears to be a quite comprehensive recitation of everything that the

22

witness said and nothing more. The thoroughness of the interview summaries also renders them less likely to reveal opinion work product; had the SEC lawyers been more sparing or selective in what they chose to write down, their notes would more easily reveal to opposing counsel what the SEC lawyers felt was important.

While the SEC interview summaries necessarily reveal some limited opinion work product by reflecting the areas of focus during the interviews and the questions that the SEC posed, these areas of focus already are (or should be) well known to Bloom based on the specificity of the 27 page amended complaint that the SEC has filed against him, describing the alleged fraud. Moreover, Bloom has not requested the SEC's pre-existing interview summaries. Instead he has asked the SEC to respond to an interrogatory asking for detailed information provided by the witnesses, in a sense supplementing what already has been provided in the Rule 26(a)(1) disclosure. This approach will allow the SEC an opportunity to omit the specific questions that the SEC posed to witnesses and otherwise attempt to cleanse the material of opinion work product.[10]

Finally, in ordering the SEC to produce limited attorney work product stemming from the four witness interviews, the Court is persuaded by Bloom's argument that it would not be fair for the SEC to have access to the information provided by these witnesses but not Bloom. (Doc. 166, at 4.) The SEC brought this enforcement action against Bloom, alleging quite extensive fraudulent conduct resulting in the loss of several hundred millions

---

[10]     If the SEC determines that it would be easier to provide the pre-existing typewritten interview summaries to Bloom, the Court will allow the SEC to redact portions revealing specific questions posed by the SEC as well as other portions of the summaries that the SEC believes to be of special concern. If the SEC elects this option, it must provide the Court with an unredacted interview summary that highlights what has been redacted (for *in camera* review).

of dollars. If the SEC succeeds at trial in proving these claims, Bloom faces serious consequences, including disgorgement of profits and civil monetary penalties. Despite the threat of possible criminal charges that led these witnesses to invoke the Fifth Amendment at their depositions (or say they would do so), each gave a lengthy interview to the SEC. Indeed, Mr. Mosley's interview took place over multiple days and resulted in a 58 page single-spaced interview memorandum in which Bloom is discussed regularly. The interviews of the three other witnesses were also extensive, captured in memoranda that were 18, 9, and 7 pages respectively (single spaced). In contrast, the SEC's Rule 26(a)(1) summary of the "discoverable information" of each witness was set forth on a half page. Bloom is entitled to more than this to enable him to defend against the charges. *Cf. Davis,* 131 F.R.D. at 395-96 (ordering the government to produce interview transcripts withheld based on the law enforcement privilege and observing that "had this been a criminal case, where the breadth of discovery is much more limited, [the defendant] undoubtedly would have been entitled to the interview transcripts in question. Thus, we see no reason why in this civil case against it, [the defendant] should be entitled to any less discovery.").

Under all the circumstances presented here, the Court finds that even under a heightened standard applicable for opinion work product, there is justification for allowing Bloom access to the information that he seeks pertaining to the interviews of the four witnesses. The SEC is ordered to respond to the interrogatory or, in the alternative, to produce the final interview summaries in redacted form for these four witnesses.

With respect to all the remaining witnesses interviewed by the SEC, the Court finds that Bloom has not made a sufficient showing to justify his request for the SEC's work product, even under the more lenient "substantial need" and "undue hardship" test. Since

24

the SEC has identified the witnesses with discoverable information, Bloom should obtain information from the witnesses directly rather than piggyback on the SEC's fact finding. *See e.g., Strauss,* 2009 WL 3459204 at *1, 7 (denying motion to compel witness notes where there was no contention that witnesses were unavailable for interview or deposition); *SEC v. Stanard,* No. 06 Civ 7736, 2007 WL 1834709, at *2 (S.D.N.Y. June 26, 2007) (denying motion to compel interview memoranda where "[d]efendants [were] free to question each of the witnesses at their deposition, and at trial"); *SEC v. Treadway,* 229 F.R.D. 454, 456 (S.D.N.Y. 2005) (same); *SEC v. Downe,* No. 92 Civ. 4092, 1994 WL 23141, at *3 (S.D.N.Y. Jan. 27, 1994) (denying motion to compel witness interview notes where defendant failed to demonstrate that deposing witness would be futile).

### C. Dates of Interviews and Participants

Bloom has also requested that the SEC provide the dates of every interview that it conducted, and the identities of those who attended (name, employer, title). The Court need not decide whether such information constitutes attorney work product because it agrees with the SEC that this information is not relevant to the claims or defenses here. Bloom says he needs to know dates of interviews in order to "deduce how many times a particular witness met with the SEC." (Doc. 166, at 11.) Further, he asserts that he must know the identity of those present at the interviews because "[i]f certain witnesses have been freely speaking to the SEC and other governmental agencies, Bloom is entitled to know when and to whom they spoke." (*Id.* at 13). Bloom's desire to know this information, however, does not make it relevant to any claim or defense.

25

It is also worth noting that during oral argument, Bloom's counsel acknowledged that it is not their position that, in every civil case, the attorneys may serve discovery to find out from opposing counsel who has been interviewed and when (on the ground that such information is not work product). Instead, Bloom's counsel argued that such discovery is permissible in this case only because there is a parallel grand jury proceeding that has had the practical effect of making witnesses unavailable to Bloom (but not the SEC). Since the Court has now identified the unavailable witnesses on the SEC's Rule 26(a)(1) disclosure and ordered the SEC to provide Bloom with the factual information that it obtained from those witnesses during their interviews, Bloom has even less of a need for the additional information that he seeks.

## CONCLUSION

For the reasons discussed above, Bloom's Motion to Compel the Production of Documents and Interrogatory Responses from the SEC (Doc. 165) is granted in part and denied in part. The SEC is given through December 20, 2010 to comply with this order.

ENTER:

Dated: December 2, 2010

SHEILA FINNEGAN
United States Magistrate Judge