**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| Plaintiff, | ) | Case No. 07 C 4684 |
| v. | ) | |
| | ) | Hon. Charles P. Kocoras |
| **SENTINEL MANAGEMENT GROUP, INC., ERIC A. BLOOM, and CHARLES K. MOSLEY,** | ) | |
| Defendants. | ) | |

**DEFENDANT ERIC A. BLOOM'S RESPONSE IN OPPOSITION
TO THE SEC's MOTION FOR SUMMARY JUDGMENT**

Theodore T. Poulos
Terence H. Campbell
Cotsirilos, Tighe, Streicker, Poulos & Campbell
33 N. Dearborn, Suite 600
Chicago, IL 60602

Matthew S. Ryan
Law Offices of Matthew S. Ryan
33 N. Dearborn, Suite 600
Chicago, IL 60602

*Attorneys for Defendant Eric A. Bloom*

December 2, 2011

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

I.    INTRODUCTION ................................................................................1

II.   LEGAL STANDARDS ........................................................................2

III.  TWO SYSTEMIC FLAWS IN THE SEC's ARGUMENT ...............................................2

      A.    Mosley's Answer to the SEC's Complaint Is Not
            Evidence Against Eric Bloom ................................................3

      B.    The SEC Fails To Address The Evidence Relating To Eric Bloom,
            As Distinct From the Evidence Relating to Defendant Mosley .............................5

IV.   THERE IS NO FACTUAL OR LEGAL BASIS TO SUPPORT THE SEC's
      CLAIM THAT BLOOM VIOLATED THE SECURITIES ACT OR
      THE EXCHANGE ACT ........................................................................6

      A.    Eric Bloom Did Not Make Any Misrepresentations
            Or Omissions Of Material Fact ........................................................7

            1.    The Undisputed Facts Establish That Bloom And
                  Sentinel Properly Disclosed The Use Of Leverage ...................................7

                  a.    The Disclosures of Leverage and the Testimony
                        Of SEC Witness Jacques Sauliere ..................................................8

                  b.    The SEC's Argument on Bloom's *Scienter*
                        Regarding The Use And Disclosure Of Leverage ........................16

      B.    The SEC's Misleading Claims Regarding Bloom
            and the Extent of Leverage ........................................................18

            2.    The Facts and Factual Disputes Relating to the SEC's Claims
                  Regarding Calculation of the Daily Rate of Return and
                  Segregation of Assets ........................................................20

                  a.    The Daily Rate ................................................................20

                  b.    The Alleged Segregation Violations and
                        Commingling of Interest ....................................................22

                  c.    Neither Bloom Nor Sentinel Misrepresented How
                        Sentinel Generated The Interest It Paid Its Investors ........28

C.     The Court Should Not Adopt An Adverse Inference Against
Bloom On The Question Of His Intent .................................................32

D.     The Alleged Misrepresentations and Omissions Were Not
"In Connection With" The Purchase or Sale of Securities ....................34

E.     The SEC's Aiding and Abetting Claims Against Bloom Also Fail ....................34

CONCLUSION .................................................................................................35

## **TABLE OF AUTHORITIES**

**Cases**

*Baxter v. Palmigiano,* 425 U.S. 308 (1976) ...............................................................32

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996) ........................4

*City of Chicago v. Wolf*, 1993 WL 524383 (N.D. Ill. 1993) ........................................33

*Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860 (S.D.N.Y. 1986) .....................8

*Goldberg v. Kelly,* 397 U.S. 254 (1970) .......................................................................4

*Gunville v. Walker,* 583 F.3d 979 (7th Cir. 2009) .......................................................4

*Haywood v. Lucent Technologies, Inc.* 323 F.3d 524 (7th Cir. 2003) ...........................4

*Holden Metal v. Wismarq*, No. 00 C 191, 2004 WL 1498152 (N.D. Ill. July 1, 2004) .................2

*Hunt v. Enzo Biochem, Inc.,* 530 F.Supp.2d 580 (S.D.N.Y. 2008) ...............................8

*In Re Edmond,* 934 F.2d 1304 (4th Cir. 1991) ............................................................4

*In re John P. Flannery, et al.*, S.E.C. File No. 3-14081 Initial Decision Release No. 438 ...........8

*In re VMS Sec. Litig.*, 752 F.Supp. 1373 (N.D. Ill. 1990).............................................34

*LaSalle Bank v. Seguban*, 54 F.3d 387 (7th Cir. 1995) ...............................................32

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) .........................................................32

*Lexion Medical, LLC v. Northgate Technologies,* 618 F.Supp.2d 896 (N.D. Ill. 2009) .................2

*Martin v. Steubner*, 485 F.Supp. 88 (S.D. Ohio 1979),
    *aff'd*, 652 F.2d 652 (6th Cir. 1981) *cert. denied*, 454 U.S. 1148 (1982) ...........................8

*Massey-Ferguson, Inc. v. Bent Equipment Co.*, 283 F.2d (5th Cir. 1960).....................18

*Morrison v. Nat'l Australia Bank Ltd.,* 130 S.Ct. 2869 (2010) .....................................6

*National Acceptance Corp. v. Bathalter*, 705 F.2d 924 (7th Cir. 1983) ........................32

*P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770 (7th Cir. 1986) .................................18

*Provenz v. Miller,* 102 F.3d 1478 (9th Cir. 1996) ......................................................18

*Quintel Corp. v. Citibank, N.A.*, 596 F.Supp. 797 (S.D.N.Y. 1984) ................................................8

*Robin v. Arthur Young & Co.*, 915 F.2d 1120 (7th Cir. 1990) ...................................................34

*SEC v. Black,* 04 C 7377, 2005 WL 1498893 (N.D. Ill. June 17, 2005) .......................................6

*SEC v. Czarnik*, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) .....................................................6

*SEC v. Pittsford Capital Income Partners, LLC*, 2007 WL 2455124
    (W.D.N.Y. August 23, 2007) ........................................................................................26

*SEC v. Rehtorik,* 135 F.R.D. 204 (S.D. Fl. 1991) ........................................................................33

*SEC v. Thomas,* 116 F.R.D. 230 (D. Utah 1987) ........................................................................33

*Stokes v. Bd. of Educ.* 599 F.3d 617 (7th Cir. 2010) .....................................................................2

*United States v. Alexander*, 743 F.2d 472 (7th Cir. 1984) .........................................................18

*United States v. Dunn*, 961 F.2d 648 (7th Cir. 1992) ..................................................................18

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) ...............................................................18

*United States v. Naftalin*, 441 U.S. 768 (1979) ...........................................................................6

*United States v. O'Hagan* , 521 U.S. 642 (1997) .........................................................................6

*United States v. Parcels of Land*, 903 F.2d 36 (1st Cir. 1990) ....................................................4

*United States v. $57,790.00 in U.S. Currency*, 2007 WL 433198
    (S.D.Cal. Jan. 29, 2007) ...............................................................................................5

I.  **INTRODUCTION**

The SEC is not entitled to summary judgment against Eric Bloom.  Here, there are serious disputes as to many of the material facts the SEC contends are undisputed.  Moreover, a careful analysis of the SEC's submission reveals that in many instances the SEC simply lacks the evidence to support its view of the purported facts – particularly as to Defendant Bloom.  Indeed, as explained herein, the SEC's submission is fundamentally flawed in that it simply ignores the overwhelming evidence contradicting, and often flatly disproving, its factual assertions (*e.g.*, as to its allegations about the disclosure of leverage, alleged commingling, and the daily interest calculation).  Further, the SEC improperly relies on inference and conjecture, ignoring the rule that Bloom, as the non-moving party, is entitled to the benefit of all reasonable inferences.  Each of these defects, and certainly all of them in combination, precludes summary judgment in favor of the SEC.

Simply put, the SEC cannot prove that Bloom made any false or fraudulent statement of material fact.  The SEC cannot prove that Bloom acted fraudulently, recklessly, or even negligently.  As to each of its claims, the evidence cited by the SEC fails to establish the facts necessary to support summary judgment against Eric Bloom.  And to the extent any evidence tends to support its claims, there exists counter evidence that, at a minimum, creates genuine issues of material fact.

To be sure, the record establishes many undisputed material facts in this case.  But those undisputed facts support Eric Bloom's cross motion for summary judgment, not the SEC's motion.  Indeed, based on the evidence of record, no reasonable trier of fact could find that Bloom acted with *scienter*, as required to prove each of the SEC's claims here.

In sum, the record evidence fails to support the SEC's claims that Bloom violated any provision of the Securities Act, the Exchange Act, or the Advisers Act, or that he aided and abetted violations of those Acts. The SEC's motion for summary judgment should be denied, and entry of summary judgment in favor of Eric Bloom is appropriate.

## II. <u>LEGAL STANDARDS</u>

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lexion Medical, LLC v. Northgate Technologies*, 618 F.Supp.2d 896, 899 (N.D. Ill. 2009). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the non-movant. *Id.* However, the Court "must view all the evidence in the record in the light reasonably most favorable to the nonmoving part[y]," *Stokes v. Bd. of Educ.*, 599 F.3d 617, 619 (7th Cir. 2010) and construe all facts and draw all inferences from the record in favor of the nonmoving party. *Lexion Medical,* 618 F.Supp.2d at 899. Thus, a district court may not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence" *Stokes*, 599 F.3d at 619. *See also Holden Metal v. Wismarq*, No. 00 C 191, 2004 WL 1498152, at *2 (N.D. Ill. July 1, 2004) (Zagel, J.) ("[S]ummary judgment on the basis of an inference is rarely, if ever, appropriate.").

## III. <u>TWO SYSTEMIC FLAWS IN THE SEC's ARGUMENT</u>

Before addressing the facts in detail, the Court should be mindful of two systemic defects in the SEC's approach to its motion for summary judgment against Eric Bloom: (1) the SEC's improper and repeated citation to Charles Mosley's Answer to its Complaint as evidence against Eric Bloom; and (2) the SEC's continual undifferentiated reference to "Bloom and Mosley" as

having done something, when the undisputed evidence establishes that Bloom and Mosley rarely, if ever, acted together with respect to any of the challenged conduct.

**A.  Mosley's Answer to the SEC's Complaint Is Not Evidence Against Eric Bloom**

Since at least December 2009, when Eric Bloom's attorneys sought to depose him (SEC Ex. 10), Charles Mosley has asserted his Fifth Amendment privilege to any substantive inquiries about all matters underlying this litigation.  Early in this case, however, rather than assert his Fifth Amendment privilege, Mosley submitted a substantive Answer to the SEC's complaint in which he admitted certain facts, denied others, and proffered additional purported facts.  (SEC Ex. 55). To a large extent, Mosley's Answer attempts to shift the responsibility for his conduct to Eric Bloom (See, *e.g.*, SEC Ex. 55, ¶¶18, 36, 39, 42, 44, 47, 55, 69, 72).  It is perhaps not surprising, then, that the SEC relies extensively – and sometimes exclusively – on Mosley's self-serving and un-cross-examined Answer as the basis for its supposed "undisputed evidence" against Bloom. (See Bloom Resp. to SEC SOF ¶¶2, 7, 13, 14, 16, 17, 18, 21, 28, 34, 51, 67, 69, 70, 72, 76, 78, 81, 84, 86, 93, 102, and 104; SEC Memo. at 7, 10, 18 n.7, and 23-24).  This is improper.

As detailed herein, the vast majority of the SEC's factual assertions about Bloom that are based on Mosley's Answer are not only false, but are flatly contradicted by the actual, *admissible* evidence of record.  As but one example, with respect to the rate of return paid to Sentinel's investors on a daily basis, in his Answer, Mosley denied "setting the interest rates on a daily basis," and asserted that he helped set the daily rates on only a "few occasions" each year based on guidelines provided by Bloom.  (SEC Ex. 55 at ¶¶69-75).  These assertions are flatly contradicted by the testimony of the two employees, Crystal York and Jeff Logan, who worked directly for Mosley throughout the relevant time period.  York and Logan both testified unequivocally that

Mosley, and Mosley alone, personally determined the daily rates for return for Sentinel's various investment pools *almost every single day*.  (Bloom SOF ¶14).

Beyond the fact that most of the SEC-cited assertions in Mosley's Answer are contradicted by the actual evidence of record, the more fundamental problem with the SEC's citations to Mosley's Answer in its summary judgment motion against Bloom is this:  Mosley's Answer may not be considered in assessing the merits of the SEC's motion for summary judgment *as to Eric Bloom* because Mosley invoked his Fifth Amendment privilege at all times after filing his Answer, including when Bloom deposed him.  Accordingly, while the statements in Mosley's Answer may be admissible against *Mosley* as statements of a party-opponent, they are inadmissible hearsay as to *Bloom*.

Under Rule 56(c) of the Federal Rules of Civil Procedure, in ruling on a summary judgment motion, a court may consider only material that would be admissible at trial.  *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise inadmissible at trial).  Moreover, it is a fundamental principle of due process that a defendant is entitled to a meaningful opportunity to cross examine an adverse witness.  *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970).[1]

---

[1] To whatever extent Mosley's Answer could be viewed as comparable to an affidavit, that gives no aid to the SEC here.  In deciding motions for summary judgment, courts routinely refuse to consider evidence in the form of affidavits when the affiant's invocation of the Fifth Amendment denied a party the opportunity to cross-examine the affiant.  *See In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) (affirming district court's ruling striking summary judgment affidavit of witness who had invoked his Fifth Amendment privilege); *United States v. Parcels of*

The statements in Mosley's Answer, therefore, can be used neither as a basis for summary judgment against Bloom, nor as a basis to create a genuine issue of fact sufficient to deny summary judgment in favor of Bloom on his cross motion. Moreover, *as to Bloom*, the Court should strike from the SEC's Statement of Undisputed Facts those paragraphs that depend on Mosley's Answer as evidentiary support for the SEC's factual assertions. (See SEC SOF ¶¶2, 7, 13, 14, 16, 17, 18, 21, 28, 34, 51, 67, 69, 70, 72, 76, 78, 81, 84, 86, 93, 102, and 104).

### B. The SEC Fails To Address The Evidence Relating To Eric Bloom, As Distinct From the Evidence Relating to Defendant Mosley

The SEC continually alleges in its Statement of Facts and in its Memorandum that "Bloom and Mosley" did certain things, when the evidence is quite different regarding what Bloom did or knew versus what Mosley did and knew. (*E.g.*, SEC SOF ¶67 ("Bloom and Mosley" increased the amount of leverage); SEC Memo. at 21 ("Bloom and Mosley" set the daily interest rates paid to Sentinel's investment pools); *id.* at 18 ("Bloom and Mosley" improperly commingled assets)). As detailed herein, the record evidence makes abundantly clear that Bloom and Mosley did not act together with respect to any of these items. Indeed, the evidence demonstrates that on multiple occasions, Mosley acted in a way that was exactly the *opposite* of what Bloom had directed. For example, the SEC claims that "Bloom and Mosley" increased the amount of leverage utilized by Sentinel (SEC SOF ¶67), when the evidence establishes that Bloom repeatedly instructed Mosley to reduce the amount of leverage Mosley, as the Head Trader, was employing. (Bloom SOF ¶30). Similarly, while the SEC baldly claims that "Bloom and Mosley" set the daily interest rates paid to Sentinel's various investment pools (SEC Memo. at 21), the actual evidence establishes beyond

---

*Land*, 903 F.2d 36 (1st Cir. 1990) (same); *United States v. $57,790.00 in U.S. Currency*, 2007 WL 433198, at *9 (S.D. Cal. Jan. 29, 2007) (where declarants refused to answer any questions at deposition "fairness requires that this Court not consider the declarations in deciding the present [summary judgment] motions.").

dispute that Mosley, and Mosley alone, determined the daily interest rate on all but a handful of days. (Bloom SOF ¶14; Bloom SOAF ¶¶32-33).

Evidence about Mosley is not the same as evidence about Bloom and the Court should beware of the SEC's propensity to simply lump them together in an attempt to camouflage the utter lack of evidence of any wrongdoing by Eric Bloom.

**IV.    There Is No Factual Or Legal Basis To Support The SEC's Claim That Bloom Violated the Securities Act or the Exchange Act**

In order to prove a violation of §10(b), the SEC must show "that defendants (1) made a misstatement or omission (2) of material fact, (3) with *scienter*, and (4) in connection with the purchase or sale of a security." *SEC v. Black*, 04 C 7377, 2005 WL 1498893 (N.D. Ill. June 17, 2005). Rule 10b-5 prohibits the same conduct prohibited by the statute under which it was promulgated, Section 10(b). *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2881 (2010); *United States v. O'Hagan*, 521 U.S. 642, 651 (1997). Further, "[t]he same elements required to establish a section 10(b) and a Rule 10b-5 violation suffice to establish a violation under sections 17(a)(1)-(3), with the exception that *scienter* is not required for the Commission to enjoin violations under subsections (a)(2) or (a)(3)." *SEC v. Czarnik,* 2010 WL 4860678, *3 (S.D.N.Y. Nov. 29, 2010.) Indeed, regarding the statutory requirements under §17(a) that a fraud occurs "in the offer or sale" of any security and under §10(b) that a fraud occurs "in connection with the purchase or sale of any security," the Supreme Court has stated that it has "on occasion used the terms interchangeably." *United States v. Naftalin,* 441 U.S. 768, 773 n. 4 (1979).

### A. Eric Bloom Did Not Make Any Misrepresentations Or Omissions Of Material Fact

The SEC cannot establish the most fundamental element of a §10(b), Rule 10(b)-5, or §17(a) securities fraud claim (nor any of its aiding and abetting claims) against Eric Bloom: a material misstatement or omission. The SEC claims that Bloom is responsible for three forms of purportedly materially false representations or omissions: (1) that Bloom fraudulently concealed Sentinel's use of leverage in its investment portfolios; (2) that Bloom falsely and knowingly represented Sentinel kept the various investor portfolio assets segregated, when in fact he directed improper commingling of those assets; and (3) that the daily statements Sentinel provided to its investors "misleadingly *suggested* that the securities listed on the statement generated the interest" paid to the investors. (SEC Memo. at 21) (emphasis added). There are substantial, material disputes on nearly every essential factual assertion underlying each of these claims by the SEC. (See, *e.g.*, Bloom's Resp. to SEC's SOF ¶¶19, 27, 54, 62-64, 67, 71, 73, 75, 77-79, 81-84, 93 and 94). The facts of record relating to each of these assertions are discussed below, *seriatim*. Simply put, the evidence does not support the SEC's allegations.

### 1. The Undisputed Facts Establish That Bloom And Sentinel Properly Disclosed The Use Of Leverage

The centerpiece of the SEC's claims against Eric Bloom is that Bloom "caused Sentinel to engage in a risky trading strategy involving extensive use of **undisclosed leverage.**" (SEC Memo. at 20). The SEC's claim that Bloom and Sentinel fraudulently concealed Sentinel's use of leverage is, quite frankly, astounding in light of the overwhelming evidence to the contrary. Indeed, the factual record in this case establishes beyond peradventure that Sentinel and Bloom candidly disclosed and discussed Sentinel's actual use of leverage, both orally and in writing, in multiple forms, and on multiple occasions.

7

Virtually all of Sentinel's investors were sophisticated institutional investors. (Bloom SOF ¶1). The law is clear that courts should consider the sophistication of an investor in evaluating fraud allegations, as the investor's sophistication is relevant to the adequacy of a challenged disclosure. *Hunt v. Enzo Biochem, Inc.,* 530 F.Supp.2d 580, 599 (S.D.N.Y. 2008); *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 891 (S.D.N.Y. 1986); *Quintel Corp. v. Citibank, N.A.,* 596 F.Supp. 797, 801-802 (S.D.N.Y. 1984); *Martin v. Steubner,* 485 F.Supp. 88, 92-93, 97 (S.D. Ohio 1979), *aff'd,* 652 F.2d 652 (6th Cir. 1981) (holding that the defendant lacked *scienter* as required under Rule 10b-5 because he assumed, based on investor's representations, that the investor was sophisticated).

In addition, the SEC misstates the applicable standard for disclosure, arguing that specific disclosures of the precise leverage being utilized in a specific investor's portfolio must be made to each investor. (SEC Memo. at 21). This is not the law. Under the law, investors, especially sophisticated investors like Sentinel's, are presumed to have considered the "total mix of information" in making investment decisions. *In re John P. Flannery, et al.,* S.E.C. File No. 3-14081, Initial Decision Release No. 438. (Bloom Ex. 75). The "total mix of information" Sentinel provided to its investors and publicly disclosed more than sufficiently disclosed its use of leverage.

### a. The Disclosures of Leverage and the Testimony of SEC Witness Jacques Sauliere

Notably, the SEC presents the testimony of one – and only one – Sentinel investor, through the person of Jacque Sauliere, to support its claim that Sentinel's use of leverage was "undisclosed." Sauliere is the Co-CEO of Capital Fund Management (CFM), the investment advisor to Discus Master Limited ("Discus"), an investment fund that was an investor in a Sentinel portfolio. (SEC SOF Ex. 51). Not only was Discus a sophisticated institutional investor itself, but

it also retained CFM, a highly sophisticated financial services entity, to advise Discus on its investments, including specifically its investment with Sentinel. (SEC Ex. 51, Sauliere Affidavit ¶1-3).

The Court may recall that Sauliere refused Bloom's requests to appear for a deposition, but after the SEC nonetheless submitted an affidavit from Sauliere in support of its motion for summary judgment, the Court ruled that if Sauliere did not appear for a deposition, the Court would strike his affidavit. At the behest of the SEC, Sauliere then finally agreed to appear for a deposition. His deposition proved quite important, as his deposition testimony undercuts almost the entirety of the relevant factual assertions he made in his SEC-drafted affidavit. (See Bloom SOAF ¶¶1-19).

In his affidavit, Sauliere claimed that he did know that Sentinel was using leverage in connection with Discuss' investment at Sentinel because "Bloom never mentioned leverage and I never asked about it." (SEC Ex. 51, Sauliere Aff. at ¶ 10). He went on to claim that he "never asked about leverage because *there was never any reason for me to suspect* that Sentinel would use leverage for its portfolios." (*Id*.). The "total mix" of information admittedly provided to CFM, however, gives quick lie to Sauliere's claim. At a minimum, the evidence demonstrates that even if Sauliere was not personally informed that Sentinel was using leverage, his company, CFM, surely was.

The total mix of information about leverage provided by Sentinel to its investors generally and to CFM/Discus specifically, is voluminous. First, CFM/Discus had been investing with Sentinel since 1999. In July, 2005, Discus, acting through Sauliere and CFM, entered into a new Investment Management Agreement with Sentinel. (Bloom SOAF ¶1). The new 2005 agreement between Sentinel and CFM/Discus was virtually identical to the 1999 agreement (*id*.), with one significant difference: whereas Paragraph 2 of the 1999 agreement, entitled "Representations,"

contained only two subparagraphs (a and b), Paragraph 2 of the 2005 agreement, also entitled "Representations," now contained an additional subparagraph (c), which provides as follows:

> Client [CFM/Discus] further represents that Client is aware *Sentinel may utilize reverse repurchase agreements and/or bank loans in one or more of the portfolios* comprising the Programs. The use of such instruments provides greater liquidity and *inherently creates a leveraged portfolio. While the use of leverage may enhance the return of the particular portfolio, it may also exacerbate any losses incurred by the portfolio in the event of a sudden adverse market move.*

(*Id*. at ¶10) (emphasis added). At his deposition, Sauliere admitted that he read every page of the new 2005 Agreement, including Sentinel's disclosure of its use of leverage. (Bloom SOAF ¶2). He further admitted that the new language in Paragraph 2(c) disclosed that Sentinel may use leverage with respect to Discus's investments at Sentinel, and even more specifically that the leverage would take the form of use of "reverse repurchase agreements and/or bank loans." (*Id*.).

In the 2005 Agreement, CFM/Discus also affirmatively represented that it/they had "received and reviewed" Part II of Sentinel's publicly-filed SEC Form ADV, which was also explicitly incorporated by reference into the Agreement. (Bloom SOAF ¶4). Part II of Sentinel's Form ADV disclosed Sentinel's use of leverage as follows:

> [Sentinel], from time to time, *may use reverse repurchase agreements and/or bank loans as part of its investment strategy* and for liquidation purposes. *The utilization of either reverse repurchase agreements and/or bank loans inherently creates a leveraged portfolio when used.* For example, where a portfolio owns a security that is trading "special" in the repurchase market, [Sentinel] may attempt to take advantage of the rate differential in such circumstances. *While the use of leverage may enable the Registrant to enhance returns, it may also exacerbate losses incurred by such portfolio*.

(*Id*.) (emphasis added).

Beyond the language of the investment agreement and the explicit disclosures in Sentinel's Form ADV, over the course of their dealings, Sentinel and Bloom sent CFM yet more materials that further disclosed Sentinel use of leverage. Thus, on or about September 3, 2004, Eric Bloom emailed a copy of Part II of Sentinel's Form ADV, dated March 28, 2004 – which likewise explicitly disclosed Sentinel's use of leverage – to CFM's back office manager, Souhaeil Chaouchi, who reported directly to Sauliere and who was Sentinel's main contact person at CFM. (Bloom SOAF ¶5). In the email, Bloom wrote to CFM's manager, ". . . it was nice speaking with you yesterday. As discussed, attached please find the information we talked about yesterday. Please call me if you have any questions." (Bloom SOAF ¶5; Bloom Ex. 92). Thus, it is apparent that Bloom not only sent the Form ADV, but discussed its contents with CFM.

On or about May 19, 2006, Anis Kraiem sent an email to Eric Bloom. (Bloom SOAF ¶6). Kraiem at that time had become the individual at CFM in charge of Discus's account at Sentinel. (*Id.*). In his email to Bloom, Kraiem wrote that he works at "CFM with Jacques Sauliere on compliance and operational issues" and specifically requested that Bloom send them Sentinel's "Latest Form ADV part II." (*Id.*). Kraiem also requested Sentinel's Audited Financial Statements for the year ending December 2005. (*Id.*). Bloom responded to Kraiem's request on May 22, 2006, emailing him a copy of Sentinel's Form ADV Part II, dated March 21, 2006, which again contained the disclosure of both Sentinel's use of leverage and the attendant risks. (Bloom SOAF ¶7). And on June 22, 2007, Sentinel again emailed to CFM its (Sentinel's) then current Form ADV Part II, dated March 16, 2007. (*Id.*). That Form ADV Bloom sent to CFM, like all the others, contained the disclosure of the use of leverage that quoted above. (*Id.*).

The SEC claims that these materials only indicate that Sentinel "may" employ leverage and thus Sentinel's investors had no idea that Sentinel actually did use leverage. But for a

sophisticated investor, even the SEC's own expert admitted that such language constitutes an adequate disclosure of leverage.  (Bloom SOF ¶27).

Perhaps even more telling, as to the SEC's star witness Jacques Sauliere specifically, he acknowledged that CFM regularly employs the use of leverage in its own portfolios for its clients and that it, too, files a Form ADV Part II.  (Bloom SOAF ¶8).  Remarkably, just like Sentinel's Form ADV, CFM's own Form ADV also provides only that CFM "***may*** use leverage as part of our investment strategy."  (*Id*.).  Sentinel's disclosure was undoubtedly sufficient.  But there is more.

On May 22, 2006, pursuant to Anis Kraiem's request, Eric Bloom specifically instructed Sentinel's CFO, T.C. Arana, to send Sentinel's audited Financial Statements to Kraiem.  (*Id*. at ¶10).  On May 25, 2006, pursuant to Blooms instruction, Arana sent an email to Kraiem attaching a copy of Sentinel's Audited Financial Statement for the year ending December 31, 2005.  (*Id*.).  Sauliere admitted that he trusted Kraiem, on behalf of CFM, to review and understand the information in an Audited Financial Statement.  (Bloom SOAF ¶12).  Sentinel's Audited Financial Statement provided to Kraiem, under the heading of "Customers' Cash and Securities Segregated and Held in Trust" advised that as of December 31, 2005, Sentinel had over $1.3 billion worth of securities sold under agreements to repurchase.  (Bloom SOAF ¶11).  ***This is, by definition, a specific disclosure of the actual use of leverage.***  Under the same heading, Sentinel's financial statement disclosed that there were $157.8 million in customer securities pledged as collateral for a short-term loan.  (*Id*.).  This, too, is a disclosure of the ***actual use of leverage***.  The same type of information was sent to Kraiem for 2006.  Specifically, shortly after the 2006 audited financial statements had been prepared, T.C. Arana via email also sent Anis Kraiem a copy of Sentinel's Audited Financial Statement for year ending December 31, 2006.  That financial statement

disclosed under the heading of "Customer Cash and Securities" that Sentinel had over $2 billion in securities out on repo. (Bloom SOAF ¶14). Just as he expected Kraiem to review and understand the financial statements Bloom caused to be sent CFM, Sauliere also admitted that he expects Kraiem understood that Discus's funds invested with Sentinel were included under the financial statement's heading for Sentinel's "Customer Cash and Securities." (Bloom SOAF ¶12).

Based on this objective, contemporaneous, documentary evidence, there can be no dispute that CFM/Discus was specifically advised of Sentinel's use of leverage – not once, but multiple times, in multiple forms, over the course of more than two years. There is also no doubt that Kraiem and CFM not only could, but did understand the information in the Sentinel-provided financial statements to be a disclosure of the actual use of leverage at Sentinel. Thus, just two days after Sentinel had filed for bankruptcy, Kraiem sent an email to Sauliere advising Sauliere that Sentinel's 2005 financials disclose "Repo leverage" of "1.3 billion for 1.2 billion in customer assets." (Bloom SOAF ¶13).

According to Sauliere, shortly after Sentinel filed for bankruptcy, Kraiem told Sauliere that he had reviewed Sentinel's financial statements after he had received them, but claimed that he had overlooked the disclosure of over $1.3 billion in securities out on repo in 2005 and over $2 billion put on repo in 2006. (Bloom SOAF ¶15). Sauliere admitted that this was a material disclosure of the use of leverage by Sentinel, as he testified that he felt sorry that Kraiem overlooked these disclosures in Sentinel's the financial statements, because if he had not overlooked them, "it would have saved us a lot of money." (Bloom SOAF ¶16).

Sentinel clearly disclosed it actual use of leverage to CFM/Discus. The substantial evidence cited above plainly disposes of the SEC's central claim – *i.e.* that Sentinel's use of

leverage was "undisclosed." At an absolute minimum, it creates a material factual dispute on the question as to whether leverage was in fact disclosed to CFM/Discus.

But in the end, the Court should hold that Sauliere's affidavit and testimony – the only evidence offered by the SEC to support its claim that leverage was "undisclosed" – is not sufficient to create a dispute sufficient to allow the SEC's case to go forward. Even putting to one side the questionable veracity of Sauliere[2], his testimony at best only establishes that he *personally* did not know that Sentinel was using leverage. But his lack of personal knowledge about the use of leverage – even if true – is irrelevant. The evidence summarized above (see Bloom SOAF ¶¶1-19), plainly establishes that Sentinel did in fact adequately disclose its actual use of leverage to its investors, including specifically CFM/Discus. Indeed, after having been confronted with all of this evidence at the deposition, Sauliere acknowledged that he now understands that others at CFM, in fact, were provided with information regarding Sentinel's use of leverage well prior to August 2007. (Bloom SOAF ¶16).[3]

Of course, CFM/Discus does not stand alone in having received multiple specific disclosures from Sentinel about its use of leverage. The several formal documents provided to CFM/Discus disclosing leverage – including the admonishments in ¶2(c) of the Investment Management Agreement (Bloom SOF ¶26); the disclosures in the yearly Form ADVs filed with

---

[2] On September 25, 2007, just one month after Sentinel declared bankruptcy, was interviewed by members of the SEC. (Bloom SOAF ¶18). At that time, according to the SEC's memorandum of his interview, Sauliere told the SEC that in *early 2007*, Anis Kraiem told him that Sentinel was using a credit facility (*i.e.* leverage) in the magnitude of $300 million. (Bloom SOAF ¶19). Sauliere went on to say that because the amount of the loan was a fraction of Sentinel's assets, he was not overly concerned with the credit facility. (*Id.*) When confronted at his deposition with these statements to the SEC, Sauliere denied having made them. (*Id.*).

[3] Thus, it is surely no coincidence that shortly after Sentinel filed for bankruptcy, CFM agreed to reduce by 50% the management it received from Discus until Discus recouped all its losses. (Bloom SOAF ¶17).

the SEC and provided annually to all Sentinel's existing and prospective investors (*id*. at ¶¶28-30); and the disclosures under the heading of "Customers' Cash and Securities Held in Trust" contained in Sentinel's Audited Financial Statements (*id*. at ¶¶31-32) – were all also provided and/or made available to ***each and every Sentinel investor***. (*Id*. at ¶¶26-32).

In addition, the Portfolio attributes that investors, including CFM/Discus, received directly disclosed that repurchase agreements are permissible investments for the 125 Portfolio and the Euro Portfolio. (SEC Ex. 51, Tab 5, DML0000507-08; Bloom SOAF ¶23). Moreover, the Portfolio Attributes as of March 31, 2007 that Sauliere received indicated that the 125 Portfolio was 25% invested in the Repo market. (SEC Ex. 51, Tab 11, DML0000570). The SEC's own expert admitted that the use of repos creates an inherently leveraged portfolio. (Bloom SOF ¶27). This is yet another specific disclosure by Sentinel of its actual use of leverage.

Finally, in addition to these formal disclosures that were made available to every Sentinel investor and potential investor, Sentinel and Bloom also made more specific disclosures to individual investors. Sentinel's sales representatives, for instance, regularly discussed the use of leverage with prospective investors. (Bloom SOF ¶33). In addition, and contrary to the SEC's argument, Eric Bloom disclosed Sentinel's actual use of leverage in the portfolio to an investor including Sentinel's use of repos and a bank loan to obtain the leverage and the discrete amount of leverage in the portfolio at the time. (Bloom SOF ¶34). In one communiqué to an investor on September 26, 2006, attached as one of the SEC's own exhibits, Bloom wrote: "As stated, from time to time, the portfolios use leverage both for investment strategy purposes as well as for liquidity purposes. When we deploy leverage, we use either a bank loan, the repo market, or a combination of both. … As you know, the use of leverage can either enhance the performance of the portfolio or it can magnify losses." (SEC Ex. 25).

15

Similarly, on March 28, 2006, Bloom wrote to an investor, disclosing Sentinel's use of repos, its employment of leverage as an investment strategy, and the amount of leverage in the Prime Portfolio at the time:

> *There are instances when the portfolio may employ leverage.* The first is if we need to raise money for an unusually large redemption request and did not want to be forced to liquidate securities. *The other would be as part of our investment strategy.*
>
> *At present, the Prime Portfolio is leveraged in order to take advantage of market conditions and interest rate differentials between the floater market and the overnight market.* … We have been employing this strategy successfully over the current rising rate cycle and have found that it works well in a controlled rising rate environment. *The risk to this strategy is if interest rates begin to rise uncontrollably.*
>
> The leverage of the Prime Portfolio is not fixed as a matter of policy. The highest it has ever been is about 2:1 and in many instances, it is zero. *Currently, it is about 1.75:1.*

(Bloom SOAF ¶21; Bloom Ex. 87, Letter to Juha Niemela) (emphasis added).

### b. The SEC's Argument on Bloom's *Scienter* Regarding The Use And Disclosure Of Leverage

Curiously, in its Memorandum, the SEC claims that Bloom's intent to defraud regarding the supposed "undisclosed leverage" is evidenced by the fact that he *did* disclose leverage to at least three different people – including another investor other than CFM – at three different times. Thus, in support of its claim that Bloom acted with *scienter*, the SEC cites to:

> (1) a telephone call Bloom had with representative of BONY in which he advised BONY that Sentinel traded on leverage and used investor assets to collateralize the BONY loan;
>
> (2) the email Bloom authored and caused to be sent to Martin Tornquist (Bloom SOF ¶34; Bloom Ex. 26) in which Bloom specifically advised an investor that Sentinel uses leverage in the investor portfolios, that repos are part of the leveraged trading, and that the securities out on repo are not reflected in the daily statements; and

16

(3) a conversation in which Bloom told Steve Stitle, one of Sentinel's salesman, that Sentinel had been using leverage in the 125 Portfolio.

(SEC Memo. at 24).

However, far from proving an intent to defraud or recklessness on Bloom's part, this evidence directly demonstrates Bloom's good faith and lack of scienter. Indeed, this evidence is entirely consistent with the other evidence that Sentinel generally, and Bloom specifically, readily and repeatedly disclosed the use of leverage through vehicles, such as the investor agreements, Sentinel's Form ADV, and Sentinel's audited financials. The fact that Bloom also specifically disclosed such information to BONY, to Martin Törnquist and to Steve Stitle only further demonstrates a lack of fraudulent intent or recklessness.

Thus, the evidence the SEC claims satisfies its burden on *scienter*, actually supports Blooms motion for summary judgment. It is difficult to follow the SEC's logic in arguing that the charges are based on Sentinel's supposed use of "undisclosed leverage," yet Bloom's fraudulent intent is proven by the fact that he did, in fact disclose it. Perhaps the SEC can illuminate the logic of its reasoning in reply.

In light of all the aforementioned disclosures and the admissions of the SEC's own expert, *inter alia*, that leverage was adequately disclosed by Sentinel in its ADV, the SEC's motion for summary judgment on its §17(a), §10(b), and Rule 10b-5 claims is entirely without merit. Rather, based on the undisputed facts of record, no reasonable trier of fact could find that Bloom failed to adequately disclose leverage (much less failed to disclose leverage at all), or that he acted either with *scienter*, or even negligently. Summary judgment in favor of Bloom is warranted.

At a minimum, there is an issue of material fact requiring the SEC's motion to be denied. Good faith on the part of Bloom – such as is established by the evidence here – is a complete

17

defense to charges of fraud. *United States v. Morris*, 80 F.3d 1151, 1165 (7th Cir. 1996) (defendants' good faith constitutes a complete defense to fraud charges; if actions are undertaken in good faith, the intent to defraud required to support a charge of fraud would be absent). *See also*, *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir.1992); *United States v. Alexander*, 743 F.2d 472, 478-79 (7th Cir.1984). Moreover, fraudulent intent is ordinarily a question to be determined by a jury or by the court as fact-finder and not on a motion for summary judgment. *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir.1986) ("resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible"); *Provenz v. Miller*, 102 F.3d 1478, 1479 (9th Cir.1996) ("generally, *scienter* should not be resolved by summary judgment"); *Massey-Ferguson, Inc. v. Bent Equipment Co.*, 283 F.2d 12, 15 (5th Cir. 1960) (fraudulent intent is ordinarily a question to be determined by the fact-finder, not in summary judgment motion).

## B. The SEC's Misleading Claims Regarding Bloom and the Extent of Leverage

One final point regarding the SEC's claims relating to the use of leverage warrants brief mention. Just as it ignored the multiple written disclosures of Sentinel's use of leverage, the SEC similarly plays fast and loose with the evidence regarding who at Sentinel determined when and how much leverage to employ. Thus, despite the existence of overwhelming evidence to the contrary, the SEC relies *solely on Mosley's Answer* to assert that Mosley "incorporated greater leverage into Sentinel's investment strategies *at Bloom's direction*." (SEC Memo. at 7) (emphasis added). In support of this assertion, the SEC cites paragraph 67 of its Statement of Undisputed Material Facts, which alleges "Sentinel under the direction of Bloom and Mosley, increased the amount of leverage in the Client Portfolios, including the 125 Portfolio." (SEC SOF ¶67). But the

sole support for the assertions of paragraph 67 of the SEC's Statement of Facts is *Mosley's Answer* – which is, as discussed above, not admissible evidence against Eric Bloom. Thus, the SEC has exactly *zero* evidentiary support for this purportedly "undisputed fact" as to the SEC's motion against Bloom.

Moreover, the portions of Mosley's Answer cited by the SEC do not even say what the SEC claims. Paragraphs 5 and 39 of Mosley's inadmissible Answer merely assert that Bloom directed Mosley to use leverage. They do not support the claim that Mosley used "greater leverage" at Bloom's direction or that the amount of leverage employed kept increasing "at Bloom's direction." In fact, there is no evidence – admissible or otherwise – that Bloom *ever* directed Mosley to increase the use of leverage. Indeed, exactly the opposite is established by the record evidence.

*First*, far from directing Mosley to increase the use of leverage, the actual evidence is undisputed that Bloom, on more than one occasion, specifically directed Mosley to *decrease* his use of leverage and the size of the BONY loan. (Bloom SOAF ¶40). And Bloom gave Mosley such instructions not just at year-end, as the SEC claims (SEC Memo. at 8), but at various times throughout the year. (Bloom SOAF ¶30).

*Second*, there is ample evidence that Mosley acted independently, and at times contrary to Bloom's express directions. For instance, the evidence unequivocally establishes that Mosley was hired as the portfolio manager in 2002, and from that point forward Bloom never made any trading decisions nor executed any trades for Sentinel. (Bloom SOF ¶16). Rather, at all relevant times, Mosley alone made all trading decisions and thereby determined the level and extent of leverage employed on a daily basis. (Bloom SOF ¶16). He did so without any input or direction from Eric Bloom. *Id.*

2. **The Facts and Factual Disputes Relating to the SEC's Claims Regarding Calculation of the Daily Rate of Return and Segregation of Assets**

a. <u>**The Daily Rate**</u>

Five times on just a single page of its memorandum the SEC misleadingly asserts that "Bloom and Mosley" set the interest rates paid to Sentinel's investors on a daily basis (SEC Memo at 21) and that "lower level employees . . . almost always obtained the interest rates to use directly from either *Mosley or Bloom*." (SEC Memo. at 10). Then, relying on Mosley's Answer, the SEC asserts that "Bloom caused the total amount of interest earned by all the securities controlled by Sentinel to be commingled and then redistributed to Client Portfolios and the House Account upon benchmarks established by Bloom." (SEC Memo. at 10). Finally, based on the above faulty factual premises, and as a key part of its claim of fraud against Eric Bloom, the SEC claims that Bloom lied about keeping investor funds properly segregated because, says the SEC:

> *Bloom and Mosley* commingled client and firm assets by pooling the interest from investments from all securities that Sentinel controlled and then distributing that interest income among the Client Portfolios and House Account, as opposed to only distributing interest to clients in a portfolio based on the interest generated by securities assigned to the specific portfolio.

(SEC Memo. at 18, citing SEC SOF ¶¶81-84) (emphasis added). These assertions are without merit.

First, from reading the SEC's submission one would erroneously conclude that Bloom and Mosley must have worked in unison on a daily basis to jointly arrive at the daily interest rate Sentinel paid to its various investment pools. Nothing could be further from the truth. Indeed, the notion that Bloom was intimately involved in determining the daily interest rate derives exclusively from Mosley's Answer to the Complaint, which is plainly inadmissible against Eric Bloom. Thus, in its Statement of [Purportedly] Undisputed Facts, the SEC relies on Mosley's

20

Answer for the claim that "[o]ften Mosley would directly set the interest rates on the Daily Yield/Rate Calculation sheet based upon guidelines set by Bloom."  (SEC SOF ¶78, citing Mosley's Answer at ¶¶ 69, 71, 72, 74).

In his Answer, Mosley asserts that "Eric Bloom … allocated the interest to Sentinel clients based on benchmarks he established" and that Mosley, "upon request by Sentinel's operations manager on a few occasions each year, helped set the interest rates based on Bloom guidelines." (SEC Ex. 55, at ¶69).  In paragraphs 71, 72 and 74 of his Answer, Mosley reiterates his claim that he helped set the daily interest rates on only "a few occasions each year" and "based on Bloom's guidelines."  (*Id.* at ¶¶71, 72 and 74).

As noted above, however, these self-serving assertions are both false and directly contradicted by actual, admissible evidence of record in this case.  The two Sentinel employees who were involved in the process, Crystal York and Jeff Logan, both testified that from the time Charles Mosley was hired as Sentinel's Portfolio manager in 2002, and continuing until Sentinel's collapse in August 2007, it was Mosley – not Bloom – who almost always determined the daily rate of interest to be paid to each pooled portfolio.  (Bloom SOF ¶14).  Even when he was out of the office, Mosley made and communicated those determinations to York and Logan via telephone or email.  (*Id.*).

At most, Eric Bloom made the daily interest calculation on only a handful of occasions. (*Id.*).  Notably, none of those specific instances can be identified, and most importantly, there is absolutely no evidence that Bloom calculated those daily rates incorrectly on those rare, unidentified occasions he was involved.  (*Id.*).  Indeed, in the rare instances in which Jeffrey Logan observed Eric Bloom calculate the Daily Rate, Logan said Bloom focused on trying to

properly distribute interest earned that day to the appropriate portfolio. (See Bloom Resp. to SEC SOF ¶¶81-87).

Finally, there is no evidence – none – that Bloom acted in concert with Mosley when Mosley determined the daily interest rates. There is also no evidence that Bloom ever established any "guidelines," trained Mosley, or provided Mosley any directive on how Mosley was to determine the daily rate of interest. The SEC's speculation is no substitute for evidence.

### b. The Alleged Segregation Violations and Commingling of Interest

On the issue of segregation, the SEC alleges that Bloom falsely represented to investors that Sentinel maintained investor assets in segregated custodial accounts when Sentinel (a) pledged certain securities held for its investors' benefit as collateral for portions of the BONY loan; (b) purportedly commingled investors' assets with other investors' assets and the House Account by virtue of maintaining one common clearing account at BONY; and (c) purportedly commingled "client funds" by commingling the interest earned on securities in the investor portfolios with interest earned by other investor portfolios and/or the House Account. (SEC Memo. at 17-19). These allegations are meritless.

There is no dispute that Sentinel and Bloom generally represented that Sentinel maintained segregated investor portfolio accounts and that it complied with the segregation requirements of the Custody Rule. But there is no evidence that Bloom believed or intended that such representations were false or misleading in any way. Indeed, just the opposite is true. Moreover, the pledging of assets for leveraged trading, the use of common clearing account, and the manner in which the daily interest was determined and assigned simply do not render false Bloom's statements about Sentinel's use of segregated custodial accounts.

As to the SEC's claim that Sentinel's use of leverage is evidence of fraud by Eric Bloom, the SEC has not a whit of support, either factual or legal. It is true that certain investor portfolio assets were pledged as collateral for corresponding portions of the BONY loan that supported Sentinel's use of leverage for the benefit of its various investment pools. But the use of such assets to support leveraged trading does not, and cannot under the facts of record, constitute a misrepresentation about the use of segregated accounts. As detailed above, the pledging of assets to support borrowing is the essence of leveraged trading, and Sentinel's use of leverage was amply disclosed to its investors in multiple forms. (Bloom SOF ¶¶25-35; Bloom SOAF ¶¶1-19; Bloom Resp. to SEC SOF ¶¶63, 73-74). There was nothing improper – and most certainly nothing fraudulent – with the use of leveraged trading, including the inherent use of portfolio assets as collateral for the loan which is part and parcel of "leveraged trading."

Similarly, the SEC presents absolutely no evidence that Sentinel commingled interest earned on one investor portfolio with interest from another or with the House portfolio, nor is there any evidence that Sentinel improperly allocated interest earned on any specific security in one portfolio to another portfolio. As noted above, the SEC first cites to paragraph 81 of its Statement of Facts, which states that "Bloom and Mosley caused Sentinel to commingle the total amount of interest earned by all Client portfolios and the House account by pooling all of the interest earned by the Client Portfolios and the House account and then redistributing it among the various portfolios." (SEC SOF ¶81). However, the only authority cited by the SEC for this "undisputed fact" is Mosley's Answer which, again, is not admissible against Bloom.

Next, the SEC relies on paragraph 82 of its Statement of Facts and SEC Ex. 68, which is comprised of a group of emails from Crystal York to Bloom communicating the Daily Yield/Rate Calculation sheet and expressing an inability to lower the "difference" column on that sheet. (SEC

SOF ¶82). The SEC contends that the "difference" "represented an instance where interest earned by one segregated Client Portfolio (or the House account) was paid to clients in another segregated portfolio or the House account." (*Id.*). However, there is no undisputed evidence regarding the meaning of the "difference" column. At her deposition, however, York had no specific recollection of anything about the emails in SEC Ex. 68 beyond emailing Eric Bloom the rates. (Bloom SOAF ¶34). Moreover, York conceded seven different times that she did not recall what the "difference" column meant or its significance. (Bloom Resp. to SEC SOF ¶82).

The SEC also cites to paragraph 83 of its Statement of Facts for the proposition that Bloom knew of, and participated in, commingling the interest of the various investment portfolios. (SEC Memo. at 21, citing SEC SOF ¶83). Paragraph 83 in the SEC's Statement of Facts cites testimony from York and Logan (Mosley's assistants), and an email from Matt Keel, Sentinel's Chief Compliance Officer, to Eric Bloom regarding the "Seg III Supplement." (*Id.*). But rather than sanctioning or participating in wrongdoing, the cited evidence demonstrates that Bloom had not been aware of any impropriety, and when he learned of it, *he specifically instructed that it be stopped*. Thus, York testified that Eric Bloom specifically instructed her that she was absolutely *not* to use the yield from one portfolio to payout interest to another. (SEC Ex. 13 (York Dep. 25-29)). Further, York testified that Bloom did not want one portfolio to subsidize another and that he gave her specific instructions to take remedial action by "bringing one rate up and one rate down." (*Id.* at 383). Thus, even assuming that York's testimony somehow proves that Sentinel improperly used the interest from one portfolio and gave it to another (which it does not), the evidence also demonstrates that immediately upon learning this had happened, Eric Bloom explicitly told York never to do it going forward and to correct the problem going backward. The undisputed evidence plainly establishes Bloom's good faith on this issue.

Moreover, after Bloom told York to change the rates to prevent the alleged "subsidizing" of one portfolio by another, York did so. (SEC Ex. 13 (York Dep.) at 122). The next day, however, Mosley came into the office. (*Id.*). York told Mosley what Bloom had instructed, but Mosley ignored Bloom's instructions and changed the rates back to where he (Mosley) wanted them. (*Id.*). Thus, the far from the manner in which the SEC posits its claims – *i.e.*, that "Bloom and Mosley" improperly determined the daily rates and commingled interest – York's testimony demonstrates that Bloom directed that the rates be properly calculated, but Mosley acted independently.

Finally, the email exchange referenced in paragraph 83 of the SEC's Statement of Facts between Bloom and Sentinel's Compliance Officer, Matt Keel, also shows Bloom making a good faith effort to understand what was happening with the interest rates. (SEC SOF ¶83, Ex. 45). The emails relate to an investor, Discus, which had invested in the "125 Portfolio" within SEG 3 (Bloom Resp. to SEC SOF ¶21). This portfolio had the same attributes as the "125 Portfolio" in SEG 1. (*Id.*; Bloom SOAF ¶37). In his email, Keel hypothesizes that allocation of interest between these two identical portfolios held in different SEG accounts may have "partially caused" a "supplement" from SEG 3 to SEG 1. (SEC Ex. 45). However, because the two 125 Portfolios shared precisely the same investments attributes, even the *SEC's expert* acknowledged that there was no prohibition or impropriety in dividing the interest earned on the same securities in these identical portfolios between the two segregated accounts, and, the SEC's expert agreed, it certainly does not prove improper commingling occurred at Sentinel. (Bloom SOAF ¶37). And Keel's exchange with Bloom shows nothing more than two members of Sentinel acting in good faith, earnestly and properly trying to determine the propriety of this scenario. (See SEC Ex. 45). Thus, the benign scenario in which some interest may have moved between the 125 Portfolio in SEG 3

and the 125 Portfolio in SEG 1 in no way establishes fraudulent conduct occurred, much less that Bloom acted with *scienter*. The sinister inference the SEC asks this Court to adopt is both inappropriate and at odds with the view of the SEC's own expert.

In any event, there is no legal authority for the proposition that interest earned (especially if not yet paid to Sentinel) on securities purchased for the benefit of investors constitutes "client funds" under the Custody Rule of the Investment Advisers Act and therefore must be maintained in a separate custodial account. 17 C.F.R. § 275.206(4)-2. Similarly, there is no legal authority equating interest earned on client funds or securities with "client funds" or "securities" that must be maintained separate from firm assets under Rule 206(4)-2. Sentinel provided investors the benefit of interest as it accrued daily, even though most Sentinel investments had a much longer duration and did not pay interest on a daily basis. (Bloom SOAF ¶40). When an investor withdrew its invested funds, Sentinel paid the investor the interest accrued, even if it that interest had not yet been actually earned and/or paid to Sentinel yet. (*Id.*). There is no legal authority holding that interest on client funds that had been accrued but not actually earned constitutes "client funds" for the purpose of the custody rule. 17 C.F.R. § 275.206(4)-2.

The only case the SEC cites for the proposition that commingling of interest earned on the various investment portfolios constitutes commingling of "client assets" with "firm assets" under the Advisers Act is *S.E.C. v. Pittsford Capital Income Partners, LLC,* 2007 WL 2455124 (W.D.N.Y. August, 23, 2007). But *Pittsford* does not hold that commingling of interest in the manner the SEC alleges that Sentinel commingled interest violates the Advisers Act. In *Pittsford,* the defendants created five separate LLC's from 1996 to 2002, all of which invested in mortgage backed securities. The private placement memoranda (PPMs) for each entity provided that "*principal* and interest" for each Pittsford Issuer offering would be paid from the proceeds of that

26

particular offering. *Id.* at *12. The court found that the defendants misrepresented this to investors, since ultimately the defendants consolidated each and every entity's independent bank account with the company bank account. The *Pittsford* defendants simply dumped all the investors' money into the company's bank account – that's a far cry from what the SEC alleges Sentinel did in this case. *Pittsford*, therefore, is inapposite.

One of the central allegations underlying the SEC's claims here is that Sentinel improperly commingled client assets with each other, and with House account assets, by virtue of the fact that BONY had only one "clearing account" through which all Sentinel securities – whether bought for the benefit of Seg 1, Seg 3, or the House – passed. The SEC argues Sentinel's single clearing account was particularly pernicious because, says the SEC, unbeknownst to any outsiders, that clearing account was lienable by BONY. The SEC claims that this was fraud, and seeks civil fines and penalties against Bloom.

There also is nothing fraudulent about Sentinel's use of a common clearing account. The SEC, with the benefit of hindsight may claim that the BONY account structure was flawed, but that cannot possibly suffice to establish fraud on the part of Eric Bloom. The account structure was created by BONY (Bloom SOF ¶44), and there is no evidence that Eric Bloom intended, devised, or believed there was any flaw in the BONY account structure – especially given that no such potential "flaw" was ever identified as a problem by either the outside auditors McGladrey & Pullen, the SEC, the NFA, or the CFTC, all of whom were well aware of both the common clearing account and the fact that it was lienable by BONY. (Bloom SOF ¶¶43-48, 53-64). Indeed, Paul Bjarnason, the former Chief Account for the CFTC, did not believe that Sentinel's use of a common clearing account violated applicable laws, regulations, and rules. (Bloom Ex. 112, Bjarnason Dep. at 19, 198-203). Bjarnason testified that a segregated clearing account was

not required by the applicable laws, regulations, and rules, and that it was not typical for a firm conducting business such as Sentinel to one common clearing account. (*Id.* at 203). Other FCM's, including Goldman Sachs, maintained accounts at BONY similar to those maintained by Sentinel. (Bloom Ex. 83, Ciacciarelli Tr. at 249-250).

In fact, the SEC should be equitably stopped from alleging any violation of the Custody Rule based on the fact of a common clearing account. It is clear that the SEC knew of and tacitly approved Sentinel's use of one common clearing account since no later than January or February 2002 when the SEC conducted a regulatory examination of Sentinel's records and operations. As part of that exam, the SEC specifically reviewed the structure of the accounts at BONY. (SOF ¶55). A work-paper from that 2002 SEC audit reveals that the SEC examiners specifically recognized that Sentinel's lone clearing account at BONY was also a lienable collateral account, and that all securities, whether purchased for Sentinel's house account or for its pooled investor portfolios, all cleared through that single account. (Bloom SOF at ¶55; Bloom SOAF ¶¶22, 23). Yet, the SEC never raised any concern about this very fact which it now claims existed as part of a scheme to defraud. (*Id.*). For these reasons, no reasonable trier of fact could find that Eric Bloom acted fraudulently, recklessly or negligently based on Sentinel's well-known, long-running use of a single clearing account.

### c. Neither Bloom Nor Sentinel Misrepresented How Sentinel Generated The Interest It Paid Its Investors.

Notably, the SEC does not allege an affirmative misrepresentation, but rather alleges that Sentinel's customer statements "*suggested* that securities listed on clients' statements had generated the interest." (Am. Cplt. at ¶68) (emphasis added). This "suggestion" hardly suffices for the *scienter* required under §17(a)(1) or §10(b) and Rule 10b-5. First, the daily statements

28

Sentinel provided to investors were not misleading. Second, as explained above, there is no undisputed evidence that Sentinel commingled all the interest earned on its portfolios, much less that Bloom caused it to do so. Here again, the SEC argues that "Bloom and Mosley" commingled the interest and set the rates after considering what competitors were paying. (SEC Memo. at 22). Yet there was no such thing as "Bloom and Mosley" at Sentinel; Mosley was an independent operator who, according to the undisputed evidence, regularly ignored Eric Bloom's instructions. Finally, the two emails the SEC cites to link Bloom to any potential misrepresentation do not support the argument that he falsely represented how Sentinel determined the interest rate paid to investors. On the contrary, those communications show Bloom's straightforward, truthful, and good faith responses to inquiries from investors.

The daily statements showed what they purported to show: the total amount the investor invested for the day, the value of the investment, the interest paid to the customer, and securities in their pool not out on repo in which the investor had an undivided pro-rata interest. (Bloom SOF ¶15). Nothing more was required. To the extent the SEC contends that the statements should have displayed Sentinel's use of leverage, it is undisputed that the Repo transactions entered into for the benefit of the investors need not be disclosed on the statement, as those securities were not in the possession or custody of Sentinel. (*Id*.). Indeed, the SEC's own expert admitted that Sentinel's statements satisfied Rule 206(4-2). (Bloom SOF ¶15).

While the SEC has presented no undisputed evidence from which one could infer that Sentinel did in fact, commingle all the interest, even assuming that happened, the SEC has no evidence that Eric Bloom caused the commingling. First of all, Charles Mosley nearly always determined the daily rate of interest to be paid to each portfolio. (Bloom SOF ¶14). Even when he was out of the office, Mosley made and communicated those determinations via telephone or

29

email.  (*Id*.).  Often when Mosley was unavailable, Crystal York set the rates herself, with no input from Eric Bloom.  (Bloom Resp. to SEC SOF ¶33).  Indeed the evidence the SEC cites as authority for Bloom's control over interest rates indicates only that York unilaterally set the rates and communicated them to Bloom via email.  There is no evidence of Bloom guiding York's or Mosley's determination of the interest rates.  Thus, at most, Eric Bloom made the determination on only a handful of occasions, none of which can be specifically identified, and there is no suggestion that on those rare occasions, Bloom determined the interest in some inappropriate fashion.  (*Id*.).  Indeed on at least one occasion Crystal York recounted, Eric Bloom set the interest rates, and the next day, Mosley reversed Bloom's decision and set them differently, suggesting that whatever methodology Mosley used, if any, it differed from Bloom's.  (Bloom SOAF ¶36).

In its desperation to pin a misrepresentation on Eric Bloom, the SEC tortures the meaning of two emails from Eric Bloom to investors.  (SEC Memo. at 21; SEC SOF Ex. 25, 48).  The SEC argues that these two communications from Bloom falsely represent how Sentinel calculated the interest it paid investors.  On the contrary, there is nothing false about them.  In response to specific questions from the investors, Bloom truthfully explained one element of the interest paid to Sentinel's investors: namely, how Sentinel incorporates the interest earned on ***one security in which the investor had a beneficial interest*** into the yield of the portfolio.

On April 27, 2006, Bloom emailed Martin Törnquist, who was then employed by Estlander & Roennlund and later employed by CFM, the investment advisor to Discus.  The following two paragraphs of that email relate to customer statements and interest earned on one security in which the investor has a beneficial interest, respectively:

> The statements you receive each day and at the end of each month show the daily money transfers, interest and management fee activity and the amount of the current investment.  …  That number ties out to the

summation of the "cost" column of the list of securities ***and it represents the securities that are held by you exclusive of securities that are out on repo.*** …

   … ***The other side of this transaction is that when the interest is accrued on the security, we are taking the coupon interest plus or minus (in the case of discount or premium bonds, respectively) the amortization amount. This total is the interest rate that is accrued daily to the bond and paid daily to the clients in that portfolio.***

(Bloom SOF ¶34; Bloom Ex. 26) (emphasis added). This email demonstrates Eric Bloom's good faith effort to explain the statements to an investor. There is no evidence whatsoever that Bloom's statement is false. First, it was true that Sentinel paid interest accrued on securities allocated to a portfolio to investors in that portfolio. Further, Sentinel also paid investors yield on securities on repo, and Eric Bloom explicitly told this investor twice in this email that securities allocated to the portfolio that are out on repo were not displayed on the statements. (*Id.*)

On December 18, 2006, Eric Bloom responded to specific questions from CFM, the investment advisor for Discus. Thierry d'Espalungue of CFM asked Sentinel "i.e. if you invest 1,000,000 $ fixed coupon @ 3.60% What is reflected in the daily statement (units, cost, price?, market value) on day 1, on day 2." (SEC Ex. 48). Bloom responded as follows:

   ***It is important to keep in mind that this is a commingled portfolio and that you participate on a pro-rata basis. When you add or redeem money, your interest in the whole changes. If you send $1 million, that money isn't used to purchase a specific security. Rather, an interest in the entire portfolio is allocated to that money so you are earning the yield of the portfolio, not a specific security.*** … So, using your example, on day one, we receive $1 million and will give you an asset list with various securities that sums to $1 million. The next day, your statement will show the credit of interest ($100 in this case since 1,000,000*.036/360 is $100) (don't be confused by the 360 in the denominator; we pay interest on a 360 basis so it is always 360. Coincidentally, your examples uses 3.6 as the interest rate) and another investment of your original $1 million. There will be another asset list that sums to $1 million but the asset list will most likely not be the same since other clients send or redeem money, bonds may have matured, we may have purchased other bonds, etc. This process will continue.

> *Please remember that the yield is that of the portfolio, not of a specific security.*

(SEC Ex. 48) (emphasis added). There is absolutely nothing false or misleading about Bloom's response; it accurately and truthfully answers the question posed, and in particular, clarifies to the investor that it is not purchasing specific securities and will not earn a yield on any particular security, but rather earns the yield of the portfolio.

### C. The Court Should Not Adopt An Adverse Inference Against Bloom On The Question Of His Intent.

The evidence discussed at length above utterly refutes the notion that Eric Bloom acted with *scienter*, or even negligently, with respect to each of the factual predicates underlying the SEC's claims. Perhaps recognizing that the evidence does not support its claims, the SEC argues, predictably, that the Court should ignore the mountain of evidence disproving its claims and simply award it victory by drawing an adverse inference against Bloom based on his invocation of his Fifth Amendment privilege. (SEC Memo. at 23). The SEC's plea is without merit.

An adverse inference *may* be drawn against a party invoking his Fifth Amendment privilege, but "the entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds." *LaSalle Bank v. Seguban*, 54 F.3d 387, 91 (7th Cir. 1995) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Thus, the invocation of one's Fifth Amendment privilege cannot be dispositive of the factual matters on which it is asserted, and should be "given no more probative value than the facts of the case warrant[]." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *see also*, *Seguban*, 54 F.3d at 390 ("the direct inference of guilt from silence is forbidden"); *National Acceptance Corp. v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983) ("a valid claim of privilege ... must not be treated as an admission of those allegations."). Moreover, the Supreme Court's decision in *Baxter* and its

progeny make clear that an adverse inference is "permitted," but not mandatory. *Baxter*, 425 U.S. at 318-19. As Judge Hart stated, "the effect of a refusal to answer is only a permissive inference, not a mandatory inference." *City of Chicago v. Wolf*, 1993 WL 524383 (N.D. Ill. 1993) (J. Hart).

Moreover, the law is clear that "the defendant has a legitimate right, free of court imposed restriction, to attack plaintiff's case by means of evidence other than his own privileged testimony," (*SEC v. Rehtorik*, 135 F.R.D. 204, 206 (S.D. Fl. 1991), citing *SEC v. Thomas*, 116 F.R.D. 230, 234 n. 16 (D. Utah 1987)), and Bloom has done exactly that, both in support of his Motion for Summary Judgment and in response to the SEC's cross-motion. This is not a case where the defendant invoking his Fifth Amendment privilege has no evidence refuting or rebutting the SEC's charges. Quite the contrary. Here there is a plethora of evidence from other witnesses and objective contemporaneous documents that support Bloom's claim of good faith. Indeed, although Bloom, acting under the conservative, cautious, and standard advice of his attorneys, has properly invoked his privilege not to answer questions, he has put forward substantial evidence from the depositions of numerous witnesses, including the SEC's own expert, and documentation amply demonstrating that he did not misrepresent, did not seek to conceal and, in fact openly discussed Sentinel's use of leverage, use of the BONY loan, and use of investor securities as collateral for part of the BONY loan. At a minimum, the evidence creates a genuine issue of material fact as to Bloom's intent.

Bloom's invocation of the privilege here, in light of voluminous testimonial evidence directly contradicting the SEC's claims, cannot support the dispositive weight the SEC seeks to place upon it.

### D. The Alleged Misrepresentations and Omissions Were Not "In Connection With" The Purchase or Sale of Securities.

The SEC's only mention of what the "securities" were that the alleged misrepresentations were "in connection with" is contained in a footnote, with no argument, merely asserting that the pro-rata interest in Sentinel pooled portfolios constitutes a "security." (SEC Memo. at 22, fn.9). This footnoted assertion is undeveloped, and involves a complex area of law. In his previously filed cross-motion for summary judgment, Bloom argued that the SEC could not prove that the alleged misrepresentations and omissions were "in connection with" the purchase or sale of securities. (Bloom Memo. In Support of His Mot. For Summ. Judg. at 5-14). We adopt and incorporate that argument here in response to the SEC's motion.

### E. The SEC's Aiding and Abetting Claims Against Bloom Also Fail

The SEC's Motion for Summary Judgment on its aiding and abetting claims against Eric Bloom should be denied. In Counts IV, VI, and VIII, the SEC alleges that Eric Bloom aided and abetted Sentinel's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; Sections 206(1) and (2) of the Advisers Act; and the Custody Rule, Rule 206(4)-2. (Cplt. ¶¶102-104; 108-110; 114-116). In order to prove each of these aiding and abetting claims, the SEC must demonstrate that Sentinel committed a primary violation, which it has not done, and that Bloom acted with the requisite *scienter* in assisting the primary violation. "The Seventh Circuit has imposed stringent standards for aiding and abetting liability. To hold someone liable for aiding and abetting, the Seventh Circuit requires *at a minimum* that the alleged aider and abettor (1) commit one of the manipulative or deceptive acts prohibited under section 10(b) and Rule 10b–5, (2) with the same degree of *scienter* that primary liability requires." *In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1400 (N.D. Ill. 1990), citing *Robin v. Arthur Young & Co.,* 915 F. 2d 1120 (7th Cir.

34

1990) (emphasis in original). For all the reasons discussed above that the SEC's claims for securities fraud under Sections 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 under the Exchange Act fail against Eric Bloom, the aiding and abetting claims also fail. Simply put, based on the facts of record in this case, no reasonable juror could find that Eric Bloom acted with *scienter*.

## CONCLUSION

For all the reasons set forth herein, Defendant Eric Bloom respectfully requests the Court deny the SEC's Motion for Summary Judgment, and that it grant Bloom's Cross-Motion for Summary Judgment on all counts.

Respectfully submitted

/s/ Terence H. Campbell
Terence H. Campbell
*Attorney for Eric A. Bloom*

Theodore T. Poulos
Terence H. Campbell
Cotsirilos, Tighe, Streicker, Poulos & Campell
33 N. Dearborn, Suite 600
Chicago, IL 60602
(312) 263-0345

Matthew S. Ryan
Law Offices of Matthew S. Ryan
33 N. Dearborn, Suite 600
Chicago, IL 60602
312 265-8267

35