UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )     07 C 4684<br>) |
| SENTINEL MANAGEMENT GROUP, INC., ERIC A. BLOOM, and CHARLES K. MOSLEY, | )<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on Plaintiff United States Securities and Exchange Commission's ("SEC") motion for summary judgment against Defendants Eric A. Bloom ("Bloom") and Charles K. Mosley ("Mosley") (collectively, "Defendants"). Defendant Bloom has filed a cross-motion for summary judgment. For the reasons set forth below, the SEC's and Bloom's cross-motions for summary judgment are denied. The SEC's motion for summary judgment against Mosley as to Counts I, II, IV, VI, and VIII is granted.

## BACKGROUND

**Sentinel's Trading Structure**

Sentinel Management Group ("Sentinel") was an investment advisor registered with the SEC and a futures commission merchant ("FCM") registered with the

Commodity Futures Trading Commission ("CFTC"). Bloom was the President and Chief Executive Officer of Sentinel for nearly twenty years and controlled the company's day-to-day operations. Bloom also served as Sentinel's Chief Compliance Officer from January 2006 through August 2007 and was responsible for reviewing Sentinel's policies to ensure its compliance with federal, state, and internal regulations. Mosley was Sentinel's Vice President, Head Trader, and Portfolio Manager for approximately five years and was responsible for supervising Sentinel's investing and trading activities.

Sentinel managed short-term investment portfolios for various types of advisory clients, including FCMs, hedge funds, financial institutions, pension funds, and individuals. Sentinel's business model was the first of its kind. Sentinel's investors could select a particular portfolio in which to invest, though Sentinel maintained the sole discretion to purchase or sell securities in each portfolio. Although Sentinel's maintained two primary portfolios, Bloom represented that Sentinel could customize the available portfolios to meet an investor's particular needs.

Rather than own any particular security in a given portfolio, Sentinel's clients would each own a pro rata interest in the portfolio. As the portfolios generated interest, Sentinel allocated this interest to the investors in proportion to each investor's pro rata share, less Sentinel's management fees. This structure provided Sentinel's clients with

same-day liquidity, as Sentinel was not required to sell any of its long-term securities to honor its investors' redemption requests. Rather, if a client withdrew its funds from a portfolio, the pro rata share of every other investor in that portfolio would increase accordingly.

**Sentinel's Account Structure**

Sentinel maintained three separate custodial accounts for its investments at the Bank of New York Mellon Corporation ("BONY"). These accounts were referred to as SEG 1, SEG 2, and SEG 3. SEG 1 held excess margin funds of registered FCMs with domestic customer deposits, SEG 2 held assets of FCMs with foreign customer deposits, and SEG 3 held assets for all other types of clients. Sentinel also maintained a House Portfolio for its proprietary trading. The House Portfolio was available to individuals affiliated with Sentinel. Bloom controlled Fountainhead Investments, Inc., an entity that invested in the House Portfolio. Mosley personally invested in the House Portfolio and additionally received a bonus equal to 10% of the trading gains in the House Portfolio. These bonuses totaled several hundred thousands of dollars over the course of Mosley's employment.

Sentinel cleared the majority of its securities transactions through two clearing systems at BONY: the GSCX and DTC systems. Sentinel cleared government securities through the GSCX system while corporate bonds cleared through the DTC system.

Sentinel maintained separate SEG 1, SEG 2, and SEG 3 accounts on both clearing systems. Sentinel's clearing account on the GSCX and DTC systems were known as the SEN account and the FC1 account, respectively. The clearing accounts also held securities for Sentinel's House Portfolio. Generally, all transactions involving government securities were cleared through the SEN account, and all transactions involving corporate bonds were cleared through the FC1 account. However, Sentinel did not have separate clearing accounts for its House Portfolio on the GSCX and DTC systems.

**Sentinel's, Bloom's, and Mosley's Representations to Clients**

Sentinel's marketing materials, and Bloom personally, indicated that Sentinel operated much like a money market mutual fund and that its investments were relatively low-risk. Sentinel represented that the securities in the SEG 1 account would have a minimum credit rating of AA and that those in its SEG 3 account would be investment-grade. Sentinel's marketing materials, and Bloom personally, further represented that Sentinel's segregated account structure protected its clients' investments from a Sentinel or BONY bankruptcy, and the only inherent risks in the investments was from standard market fluctuations and Sentinel's potential use of leverage.

**Sentinel's Relationship with BONY**

Sentinel and BONY's relationship was governed by a series of agreements, each of which was negotiated and signed by Bloom. BONY provided Sentinel with financing through a loan secured by Sentinel's clearing accounts. The BONY loan was not a committed financing arrangement, but rather was an overnight loan that was reentered every night. BONY maintained the discretion whether and to what extent to extend the loan to Sentinel each day, and Sentinel maintained the discretion whether and to what extent to request the loan each night. As part of its agreements with BONY, Sentinel was to segregate the funds and securities in each SEG account from its own assets and from other SEG accounts. Sentinel would use the funds from the loan for client redemptions, to purchase securities for clients who indicated they would deposit money with Sentinel but had not yet done so, and as part of a leveraged investment strategy. At its peak, the BONY loan escalated to over $573,000,000 in June 2007.

BONY required that Sentinel maintain enough securities in its SEN clearing account on a daily basis to collateralize the loan. At the end of each day, BONY would transfer as many securities as it needed to collateralize the loan from the SEN accounts, which also held securities for the House Portfolio, into another account, designated the SLM account. If Sentinel did not have enough securities in its clearing accounts to

collateralize the loan, it would transfer securities from one of the SEG accounts into the SEN accounts, and then BONY would transfer them to the SLM account where they would be held to secure the loan. Crystal York ("York"), the employee primarily responsible for booking the loan each night, testified that she indiscriminately chose which securities to pledge as collateral with no consideration for how Sentinel allocated the BONY loan among the portfolios. York testified that she generally used the highest valued securities, most often SEG 1 assets, to pledge for the loan. In the summer of 2007, Bloom instructed Sentinel employees to primarily use SEG 3 securities to collateralize the BONY loan, and to use SEG 1 securities only if the SEG 3 securities were insufficient.

The SEC alleges that due to the arbitrary nature by which York selected securities to pledge as collateral, Sentinel's clients' securities were being used to collateralize the portion of the loan that benefitted the House Portfolio. The SEC alleges that Bloom and Mosley were aware that clients' securities were being used as collateral for the BONY loan to benefit the House Portfolio.

**Sentinel's Use of Leverage**

In early 2004, the CFTC changed its rules to allow FCMs to use repurchase agreements as a form of leverage. Bloom recommended that Sentinel increase the amount of leverage in its client portfolios to take advantage of this rule change.

Sentinel began using reverse repurchase agreements ("reverse repos"), in which Sentinel would sell a security to a broker for cash at below-market value with an express commitment to repurchase that security at a higher price. The difference between the sale price and repurchase price is known as a "haircut." Sentinel profited through its use of reverse repos to the extent that the securities' increase in value over the duration of the reverse repo agreement exceeded the haircut. By 2007, Sentinel was highly leveraged due to its extensive use of reverse repos. The SEC maintains that Bloom and Mosley were aware of Sentinel's extensive use of leverage and that the use of reverse repos exposed Sentinel's clients to greater risks.

**Sentinel's Interest Payments**

Bloom developed a spreadsheet that Sentinel employees used to determine what interest rate to pay to each of its investors' portfolios on a daily basis. The SEC alleges that either Bloom or Mosley would either directly set the interest rates in the spreadsheet or instruct Sentinel employees where to set the interest rates. The SEC further alleges that Sentinel commingled the total amount of interest earned by both the client securities and Sentinel's proprietary securities and then redistributed it among the various portfolios. Because the House Portfolio maintained below-grade securities, the SEC alleges that Sentinel distributed interest from these high-risk securities to its investors.

Sentinel sent each of its clients a daily statement reflecting the amount of interest that had accrued on each investment. The SEC alleges that because the interest generated by the portfolios was pooled and redistributed arbitrarily, the interest rates set by Bloom and Mosley bore no relation to the securities held in the clients' segregated accounts.

**Sentinel's Collapse**

In June 2007, a broker with whom Sentinel had over one billion dollars in outstanding reverse repos began to redeem these repos with Sentinel. In July 2007, another broker with whom Sentinel had approximately $600 million in outstanding reverse repos followed suit. Sentinel drew on the BONY loan to pay off these brokers, and the outstanding amount of the loan ballooned to over $570 million. On August 13, 2007, Sentinel tapped out its sources of funds, including the BONY loan, and ran out of cash to meet its clients' redemptions. On August 17, 2007, BONY sent a letter to Bloom stating that Sentinel was in default under the terms of the loan agreements and that BONY had the right to sell the securities pledged as collateral. That same day, Sentinel filed for Chapter 11 bankruptcy.

On June 16, 2008 the SEC filed a First Amended Complaint in which it alleged that Bloom, Mosley, and Sentinel violated various federal securities laws. Throughout the subsequent investigation, Bloom invoked his Fifth Amendment right against self-

incrimination. Although Mosley answered the SEC's complaint, he too subsequently invoked his Fifth Amendment rights. On January 5, 2009 Sentinel consented to judgment on the SEC's complaint. The SEC now moves for summary judgment against Bloom and Mosley, the only remaining defendants.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v. Cook Cnty.*, 563 F.3d 598, 602-03 (7th Cir. 2009). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). A non-movant's failure to respond to a motion for summary judgment does not automatically result in a judgment for the movant. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Rather, the ultimate burden of persuasion remains with the movant to show that it is entitled to judgment as a matter of law. *Id.* In considering a motion for summary judgment, a court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2010).

## DISCUSSION

### SEC v. Bloom

**I. Evidentiary Matters**

As a preliminary matter, Bloom challenges the SEC's reliance on two pieces of evidence. First, Bloom moves to strike the affidavit of Jacques Sauliere ("Sauliere"), the co-CEO of a company that invested money with Sentinel. Bloom maintains that although Sauliere submitted an affidavit, he subsequently evaded a deposition by Bloom. Because Sauliere subsequently submitted to a deposition, Bloom's motion to strike Sauliere's affidavit is denied as moot.

Second, Bloom seeks to strike Mosley's answer to the SEC's complaint. A court may exclude a witness' testimony from consideration on a motion for summary judgment if the witness invokes his Fifth Amendment right against self-incrimination on cross-examination. *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990) (collecting cases). Although Mosley initially answered the complaint, he subsequently invoked his Fifth Amendment right against self-incrimination to all substantive questions when deposed by Bloom's attorneys. Therefore, the SEC may not rely on Mosley's answer in its motion for summary judgment against Bloom, as Bloom has not been afforded an opportunity to meaningfully cross-examine Mosley. However,

Mosley's answer is admissible in the SEC's motion for summary judgment against Mosley himself.

## II. Counts I, II, and III

Counts I, II, and III allege that Bloom violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1) ("Count I"), Sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2), (3) ("Count II"), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 9240.10b-5 ("Count III"). These statutes prohibit fraud in connection with securities transactions. To establish a violation under Section 10(b) of the Exchange Act and Rule 10b-5, the SEC must show that the defendants "(1) made (2) a false statement or omission of material fact (3) with scienter (4) in connection with the purchase or sale of securities."[1] *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006) (citing *SEC v. Maio*, 51 F.3d 623, 630 (7th Cir. 1995)). The elements for a claim under Section 17(a)(1) are identical, and the SEC's claims in Counts I and III thus rise and fall together. *Maio*, 51 F.3d at 631. The elements for a claim under Sections 17(a)(2) and (3) are nearly

---

[1] The parties have tailored their arguments to the "misrepresentation" theory of liability of Rule 10b-5(b), which requires that a defendant make a false statement or omission of material fact. Rule 10b-5 also permits other theories of liability. For example, Rule 10b-5(a) prohibits an individual from employing "any device, scheme or artifice to defraud" investors, and Rule 10b-5(c) prohibits an individual from engaging "in any act, practice, or course of business which operates . . . as a fraud or deceit" upon an investor. 17 C.F.R. §§ 240.10b-5(a), (c). As the parties do not address these alternative theories of liability, the ensuing analysis is limited to allegations under the misrepresentation theory of liability under Rule 10b-5(b).

identical, with one exception: negligence rather than scienter is sufficient to establish culpability under these sections. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982).

### A. "Made"

The Supreme Court recently limited the scope of primary liability under the federal securities laws in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011). The court held that the "maker" of a statement for purposes of Rule 10b-5 is "the person or entity with ultimate authority over the statement, including its content and whether or how to communicate it." *Id.* at 2302. The Court explained that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.* In light of this decision, the SEC does not dispute that Bloom was not the maker of the statements contained in Sentinel's prospectuses and marketing materials. Accordingly, we will only consider statements personally made by Bloom in evaluating the SEC's allegations that Bloom violated Section 10(b) of the Exchange Act and Rule 10b-5.[2]

### B. False Statement or Omission of Material Fact

The SEC alleges that Bloom misrepresented the risk associated with Sentinel's investment strategy in four ways: (1) Bloom failed to disclose Sentinel's extensive use

---

[2] Ultimately, *Janus* does not significantly affect the SEC's allegations against Bloom, as Bloom personally made statements similar or identical to the statements contained in Sentinel's marketing materials that the SEC maintains were misrepresentations.